WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Thomas MacWright (TM-2233)

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
John K. Cunningham (JC-4661)
Richard S. Kebrdle

*Attorneys for José Carlos Santos
as Petitioner and Foreign Representative*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | Chapter 15 |
| **REDE ENERGIA S.A.,**[1] | Case No. 14-_____ (  ) |
| **Debtor in a Foreign Proceeding.** | |

### FOREIGN REPRESENTATIVE'S PETITION FOR RECOGNITION OF BRAZILIAN BANKRUPTCY PROCEEDING AND MOTION FOR ORDER GRANTING RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 105(a), 1507(a), 1509(b), 15151, 1517, 1520 AND 1521

### Introduction

Petitioner, José Carlos Santos (the "Petitioner" or the "Foreign Representative"),

is the authorized foreign representative of Rede Energia S.A. ("Rede" or the "Debtor") in the

judicial reorganization proceeding (the "Brazilian Bankruptcy Proceeding") before the Second

Court of Bankruptcies and Judicial Restructuring Court of the Central Civil Court of the City of

---

[1] The last four digits of the Debtor's Brazilian Corporate Taxpayer Registration Number are 01-49. The Debtor's executive headquarters is located at Avenida Paulista, 2439, 5th Floor, Cerqueira Cesar, City of São Paulo, State of São Paulo, Brazil. The Debtor was formerly known as Caiuá Serviços de Eletricidade S.A. and then Rede Empresas de Energia Elétrica S.A.

São Paulo, State of São Paulo (the "Brazilian Bankruptcy Court"), pursuant to Federal Law No. 11.101 of February 9, 2005 under the laws of the Federative Republic of Brazil ("Brazil"). The Petitioner, on behalf of the Debtor, hereby moves the Court for the entry of an order substantially in the form annexed hereto as Exhibit "A" (the "Proposed Order") pursuant to sections 105(a), 1507(a), 1509(b), 1515, 1517, 1520(a) and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), (a) granting the Verified Petition Form in this case and recognizing the Brazilian Bankruptcy Proceeding as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code, (b) recognizing the Petitioner as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, in respect of the Brazilian Bankruptcy Proceeding, (c) giving full force and effect in the United States to the Brazilian Reorganization Plan and the Brazilian Confirmation Order (each as defined below), (d) authorizing and directing (i) the Bank of New York Mellon (the "Indenture Trustee"), in its capacity as the indenture trustee under that certain indenture dated as of April 2, 2007 (the "Indenture") relating to the issuance of the Debtor's 11.125% perpetual notes in the aggregate principal amount of USD$400 million (the "Perpetual Notes") and (ii) the Depository Trust Company (the "DTC"), in its capacity as the record holder of the Perpetual Notes, to take any and all actions necessary to give effect to the terms of the Brazilian Reorganization Plan, (e) permanently enjoining all persons from commencing or taking any action in the United States to obtain possession of, exercise control over, or assert claims against the Debtor or its property, and (f) granting such other and further relief as the Court deems just and proper. In support of this Motion, the Petitioner refers the Court to the statements contained in (A) the *Declaration of José Carlos Santos in Support of (I) the Foreign Representative's Petition for Recognition of Brazilian Bankruptcy Proceeding and Motion for Order Granting Related Relief and (II) Certain Related Relief* (the "Petitioner Declaration") and (B) the *Declaration of Thomas Benes Felsberg*

2

MIAMI 990724

*as Brazilian Counsel to Rede Energia S.A.* (the "Brazilian Counsel Declaration"), which were filed concurrently herewith and incorporated herein by reference. In further support of the relief requested herein, the Petitioner respectfully represents as follows:

### Preliminary Statement

Rede, which is incorporated and has its center of main interests in Brazil, is the parent of a group of subsidiary entities (collectively, with Rede, the "Rede Group"), which constitute one of the largest electric power companies in Brazil. Through its operating subsidiaries, Rede Group distributes electricity to millions of customers throughout a large region of Brazil, including the States of São Paulo, Minas Gerais, Paraná, Mato Grosso and Tocantins.

On November 23, 2012, due to (among other reasons) deteriorating financial conditions that threatened Rede Group's ability to continue operations and the intervention by the Brazilian government into its power generation facilities, Rede and certain of its subsidiaries commenced its Brazilian Bankruptcy Proceeding pursuant to Federal Law No. 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law"). Consistent with Brazilian Bankruptcy Law and certain financial conditions precedent imposed by Brazilian regulators, Rede submitted its plan of reorganization (the "Brazilian Reorganization Plan"), pursuant to which Energisa, S.A. ("Energisa") will invest approximately R$1.9 billion in Rede and assume certain operating obligations of Rede Group in exchange for ownership of reorganized Rede. The Brazilian Bankruptcy Court entered an order approving the Brazilian Reorganization Plan on September 9, 2013, which was clarified by a subsequent order on November 14, 2013 (as clarified, the "Brazilian Confirmation Order"). Although subject to a number of pending appeals, the Brazilian Confirmation Order and Brazilian Reorganization Plan are in full force and effect and

have not been stayed by any court.  Rede expects all conditions precedent to consummation of the Brazilian Reorganization Plan will be satisfied or waived by the middle of February 2014.

Rede's contacts with the United States include the issuance of the U.S.-dollar-denominated Perpetual Notes, which are governed by New York law.  The Brazilian Reorganization Plan provides for a 25% cash distribution to holders of the Perpetual Notes subject to and in accordance with the terms of the Brazilian Reorganization Plan.  Upon payment made to the Indenture Trustee on behalf of the Noteholders, such Perpetual Notes shall be deemed to have been assigned to Energisa under Brazilian Bankruptcy Law.

Accordingly, the Petitioner, on behalf of the Debtor, commenced this chapter 15 case to obtain relief from this Court so as to (i) recognize the Brazilian Bankruptcy Proceeding as a Foreign Main Proceeding (as defined below), (ii) facilitate distributions to the Noteholders and the assignment of the Perpetual Notes to Energisa, as provided by the Brazilian Reorganization Plan, (iii) grant full force and effect and comity to the Brazilian Confirmation Order, and (iv) permanently enjoin all persons from taking any action in the United States to obtain possession of, exercise control over, or assert claims against the Debtor or its property in contravention of the Brazilian Reorganization Plan and the Brazilian Confirmation Order.

Rede was previously the parent of Centrais Elétricas do Pará S.A. ("CELPA"), an electricity distribution concessionary for the Pará region.  CELPA filed a judicial restructuring proceeding in Brazil in 2012 pursuant to which the Debtor's ownership in CELPA was sold to a non-affiliated third party.  In November 2012, CELPA's foreign representative filed a chapter 15 case in this Court, Case No.12-14568 (SCC) (the "CELPA Chapter 15 Case").  This Court granted the requested relief, and the CELPA Chapter 15 case was subsequently closed by order dated April 25, 2013.  See Centrais Elétricas Do Pará S.A., No. 12-14568 (SCC).

4

## Jurisdiction and Venue

1.      This Court has jurisdiction to consider this Motion pursuant to sections
157 and 1334 of title 28 of the United States Code, as well as the Amended Standing Order of
Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re:
Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.)  (the "Amended Standing
Order").

2.      This case has been properly commenced pursuant to section 1504 of the
Bankruptcy Code by the filing of a verified petition for recognition of the Brazilian Bankruptcy
Proceeding pursuant to section 1515 of the Bankruptcy Code.  This is a core proceeding pursuant
to section 157(b)(2)(P) of title 28 of the United States Code.

3.      Venue is proper in this Court pursuant to sections 1410(1) and 1410(3) of
title 28 of the United States Code.

4.      The statutory predicates for the relief requested herein are sections 105(a),
1507(a), 1509(b), 1515, 1517, 1520 and 1521 of the Bankruptcy Code.

## Background

**A.      Rede's Businesses**

5.      Rede is a Brazilian electricity holding company and one of the largest
private business groups in the Brazilian electric-power industry.  Rede is incorporated under the
laws of Brazil and maintains its principal place of business in São Paulo, Brazil.  Rede does not
assert that it has a domicile in the United States.

6.      Substantially all of Rede's assets are located in Brazil.  As of the date
hereof, Rede's sole property in the United States is an interest in an undrawn retainer with White
& Case LLP, Rede's U.S. counsel in connection with the filing of this chapter 15 case, which is
being held in an interest-bearing client trust account with Citibank in the Borough of Manhattan

5

MIAMI 990724

in the City of New York, New York (the "Client Trust Account").  Pursuant to the terms of an

engagement letter between Rede and White & Case LLP dated December 27, 2013, Rede

deposited USD$50,000.00 in the Client Trust Account on January 7, 2014 and such funds remain

in the Client Trust Account as of the date hereof.  White & Case LLP is only permitted to apply

the funds in the Client Trust Account to outstanding invoiced amounts with Rede's prior written

consent.  Rede is the beneficiary of all interest that accrues on the funds in the Client Trust

Account.

7.      Rede operates through its subsidiaries, which are engaged in the

distribution, generation and trading of electricity in Brazil.  Rede currently supplies electricity to

approximately 3.3 million customers in approximately 436 municipalities in six Brazilian states.

In 2012, Rede distributed 14,442 GWh of energy, recorded a net loss of R$665.8 million, and

gross operating revenue of R$7.515 billion.  As of December 31, 2012, Rede and its subsidiaries'

total assets were valued at approximately R$9.00 billion.  As described below, Rede operates

businesses that span key areas of the energy industry.

<u>Distribution Business</u>

8.      Rede's principal business is the distribution of electricity through its

subsidiaries.  The distribution business involves the generation or purchase and sub-transmission

of high voltage electricity, typically between 138kV and 69kV, which it transforms into medium

and low voltages, then distributes and sells to end-users.  Rede's distribution business is subject

to electricity-distribution-concession agreements and to comprehensive regulation by Agência

Nacional de Energia Elétrica ("ANEEL"), a Brazilian federal governmental regulatory agency,

and the Brazilian Ministry of Mines and Energy ("MME").

9.      Rede distributes electricity through its subsidiaries CEMAT, CELTINS

6

and ENERSUL, which are respectively the sole electricity distribution concessionaires in the Mato Grosso, Tocantins and Mato Grosso do Sul regions.  Rede also manages the REDE SUL/SUDESTE operating unit, which is composed of five subsidiaries: (i) Empresa de Distribuição de Energia Vale Paranapanema S.A., (ii) Caiuá Distribuição de Energia S.A., (iii) Companhia Nacional de Energia Elétrica, (iv) Empresa Elétrica Bragantina S.A. and (v) Companhia Força e Luz do Oeste.  The REDE SUL/SUDESTE unit operates in various municipalities or regions within the states of São Paulo, Minas Gerais, and Paraná.

10.     In 2012, Rede's electricity-distribution operations accounted for 96.4% of its gross operating revenue on a consolidated basis, the vast majority of which was derived from selling electricity at regulated tariffs to customers that are prohibited under Brazilian law from acquiring electricity from another source.

Generation Business

11.     Rede also operates an electricity generation business to complement its electricity distribution business.  Rede has direct ownership of Tangará Energia S.A., which owns 64.0% of the concession to operate the Guaporé hydroelectric plant and hence entitles Rede to 64.0% of the total electricity generated by the Guaporé hydroelectric plant, which is located on the Guaporé River and has a total installed capacity of 120.0 MW.

Trading and Other Businesses

12.     Rede operates electricity-trading operations through its subsidiary, Companhia Técnica de Comercialização de Energia ("CTCE").  CTCE is focused on serving industrial and other large customers that are permitted under current Brazilian regulations to select their electricity supplier both inside and outside the concession areas of Rede's electricity distribution companies.  In 2012, CTCE recorded gross operating revenue of R$156.6 million

7

and a net loss of R$27.3 million.

13.    Finally, Rede, through its subsidiary, Rede Electricidade e Serviços S.A., ("REDESERV"), provides services related to the engineering design and construction of substations and other assets used in providing electricity services.  REDESERV recorded gross operating revenue of R$18.9 million and net income of R$1.9 million in 2012.

**B.    Summary of Rede's Debt Structure**

14.    Under the Indenture, Rede issued the Perpetual Notes in the aggregate principal amount of USD$400,000,000.  Subsequently, Rede exercised its right under the Indenture to issue additional Perpetual Notes having identical terms and conditions and voting rights as the previously-issued Perpetual Notes in the aggregate principal amount of USD$175,000,000.  As of November 2013, there was an aggregate principal amount of USD$496,000,000 in outstanding Perpetual Notes.

15.    The Perpetual Notes are "perpetual" in nature, have no stated maturity and bear an interest rate of 11.125% per annum.  The Perpetual Notes are general, unsecured obligations of Rede and are pari passu with all of Rede's other unsecured obligations.  With regard to the Perpetual Notes, The Bank of New York Mellon is the Indenture Trustee, The Bank of Tokyo-Mitsubishi UJF Ltd. is the principal paying agent, and The Bank of New York (Luxembourg) S.A. is the special Luxembourg paying agent.

16.    Rede has total debt approximating R$3.5 billion, including the claims by surety, endorsements, or joint obligations.  Of this debt amount, Rede had approximately R$2.8 billion in unsecured debt, including the Perpetual Notes and R$134.5 million in secured debt, while Rede's debt arising from surety, endorsements or joint obligations was approximately

8

R$698.0 million.[2]

### C.   Events Precipitating Commencement of the Brazilian Bankruptcy Proceeding

17.     Despite Rede's prominent position in Brazil's electricity distribution, generation and commercialization market, the company, in recent years, has faced formidable challenges from both poor market conditions and government regulations.

18.     Difficult macroeconomic business and market conditions in Brazil have seriously impaired Rede's financial condition.  In addition, because Rede provides its services to a large part of Brazil, including sparsely populated and undeveloped regions with poor infrastructure and higher levels of poverty, it has had to carry out proportionally larger capital investments and incur additional operational and maintenance costs as compared to other similar Brazilian power companies, all of which have increased Rede's indebtedness and hampered its ability to comply with its obligations.

19.     Moreover, the regulatory environment in Brazil has undergone dramatic changes putting additional stress on Rede's business.  Starting in 1995, the Brazilian government has enacted, among other things, laws and regulations relating to concessions, tariff revisions, the commercialization of electricity, and the rules regulating the treatment of consumers (namely, who may and may not choose their electricity provider).  Further, both to help enforce these new regulations and to represent the energy sector, the Brazilian government established various regulatory agencies, including ANEEL.

20.     In light of these new regulations and the difficult business environment in Brazil and in an effort to stay competitive in the complex and challenging energy market, Rede was forced to drastically increase its debt levels to make several large and high-risk investments

---

[2]     Rede's indebtedness comprise amounts in Brazilian Reais (R$) and US dollars.  The latter was converted into R$ for the purpose of this Petition in accordance with the terms of the Brazilian Reorganization Plan.

in recent years.

21.     On August 31, 2012, and pursuant to Brazilian Federal Law No.
12,767/2012, ANEEL intervened in and seized operational control over eight of Rede's
electricity distribution concessionaires.  By seizing these entities, ANEEL sought to ensure that
Rede's financial troubles would not destabilize the proper distribution of energy and related
services throughout Brazil.  This intervention, however, only compounded the difficulties Rede
was facing and aggravated its already weakened financial condition.  For example, on November
20, 2012, ANEEL revoked the authorization for the electricity trading of Rede's subsidiary,
CTCE.

**D.     The Brazilian Bankruptcy Proceeding**

22.     On November 23, 2012, Rede filed a voluntary bankruptcy petition in the
Brazilian Bankruptcy Court, thus commencing its Brazilian Bankruptcy Proceeding.  Shortly
thereafter, in an effort to gain financial stability, Rede began to market its subsidiaries in
exchange for a capital injection.  Around this same time and pursuant to Brazilian federal law,
Rede submitted to ANEEL an administrative plan of reorganization and correction of failures
and infractions, which ANEEL reviewed, analyzed and preliminarily approved on December 18,
2012 (as modified, the "ANEEL Plan").  Among other things, the ANEEL Plan required that a
third party purchase Rede and invest at least R$1,100,000,000 in equity into the company's
operating subsidiaries before ANEEL would consent to ending its intervention over these
subsidiaries.

23.     On, December 19, 2012, the Brazilian Bankruptcy Court issued a decision
approving the commencement of the joint reorganization proceeding of Rede and certain of its
related companies (i.e., Companhia Técnica de Comercialização de Energia – Debtor in

10

Possession, QMRA Participações S.A. – Debtor in Possession, Denerge Desenvolvimento

Energético S.A. – Debtor in Possession, and Empresa de Eletricidade Vale do Paranapanema

S.A. - Debtor in Possession).  Also, in December 2012, CPFL Energia and Equatorial Energia

(hereinafter, "Equatorial–CPFL") signed an agreement with Rede to take over the company and

fund needed investments.  On March 15, 2013, Rede presented to the Brazilian Bankruptcy

Court a reorganization plan based on its agreement with Equatorial–CPFL (the "Equatorial-

CPFL Plan").  The Equatorial-CPFL Plan provided that unsecured creditors (including

Noteholders) would receive either: (i) cash equal to 15% of the principal amount of the claim at

on the closing date or (ii) new notes in Brazilian reais in the nominal amount of 65% of the

principal amount of their claims, which would be paid out over 27 years.

>  24.    In March 2013, several of the Noteholders formed an ad hoc group (the

"Ad Hoc Group") and retained separate counsel both in Brazil and in the United States.  The

members of the Ad Hoc Group also obtained authorization from the Brazilian Bankruptcy Court

for certain of its members to attend and vote at the court-supervised creditors' meetings,

independently of the Indenture Trustee.  The Ad Hoc Group and the Indenture Trustee (at the

direction of the Ad Hoc Group and other Noteholders) objected to the Equatorial-CPFL Plan,

arguing, among other things, that the plan improperly substantively consolidated Rede with

certain of its affiliates and that Noteholders were entitled to a higher recovery.  On May 27,

2013,  the Brazilian Bankruptcy Court, applying applicable Brazilian law, overruled those

objections.  In its decision, the Brazilian Bankruptcy Court confirmed the joint filing of Rede and

its affiliated debtors and allowed those entities to present to their creditors on a consolidated

basis a single reorganization plan for voting, as if they were creditors of one single entity with

joint assets and liabilities.  The Ad Hoc Group and Indenture Trustee then appealed and sought

11

expedited consideration and an injunction, but both were denied. As the appellate court has not issued a final decision, the Brazilian Bankruptcy Court's decision is still in full force and effect. Thus, the Equatorial-CPFL Plan was submitted to the creditors for voting.

25.    As explained in more detail in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law provides that creditors must vote on a plan of reorganization at a court-supervised meeting of creditors. Moreover, under the Brazilian Bankruptcy Law, stakeholders are split into three classes: labor, secured creditors, and unsecured creditors. To approve a plan, a majority in number and a majority of the principal amount of the claims in each class must vote to accept the plan at the meeting of creditors.

26.    The first court-supervised creditors' meeting was held in late May 2013, but was discontinued prior to creditors voting on the Equatorial-CPFL Plan. [3]

27.    After the first court-supervised creditors' meeting, another Brazilian company, Energisa, an energy distribution company headquartered in Cataguases, Minas Gerais state, publically announced a competing bid to purchase Rede. Initially, Rede rejected this alternative bid because, among other reasons, Rede believed that there were structural problems with the Energisa's acquisition proposal and that the bid was subject to significant contingencies, due to the restructuring requirements imposed by ANEEL after its intervention. On the day prior to the second court-supervised meeting held on July 3, 2013, Energisa revised its offer and submitted the Brazilian Reorganization Plan that was approved by the Brazilian Bankruptcy Court and that addressed Rede's concerns and ANEEL's equity infusion requirements.

28.    Pursuant to the Brazilian Reorganization Plan, Energisa committed to

---

[3]    Under Brazilian law, a class of labor representatives is sometimes formed and permitted to vote at the meeting of creditors. A labor class of labor representatives was not formed in the Brazilian Bankruptcy Proceeding. As a result, the classes of secured and unsecured creditors were the only two classes entitled to vote on the Brazilian Reorganization Plan.

MIAMI 990724

invest approximately R$1.9 billion in Rede's infrastructure. The Brazilian Reorganization Plan further provides Rede's unsecured creditors with, at their collective option, either (i) a cash distribution on the closing date equal to 25% of the principal amount of the Perpetual Notes (instead of 15% contemplated by the Equatorial-CPFL Plan) or (ii) the choice between two types of new notes in Brazilian reais in the nominal amount of 100% of the principal amount of the claims paid out over 22 years (instead of 65% paid out over 27 years as contemplated by the Equatorial-CPFL Plan). [4] The controlling shareholders of Rede agreed to transfer all their equity participation to Energisa in consideration for the symbolic price of one Brazilian Real (R$1.00). Therefore, shareholders of Rede will not hold or receive any value under the Brazilian Reorganization Plan. The Brazilian Reorganization Plan is also premised upon ANEEL lifting the intervention on Rede's concessionary subsidiaries.

29.    After the Brazilian Bankruptcy Court suggested that it would not allow a vote on both the Equatorial-CPFL Plan and the Brazilian Reorganization Plan at the court-supervised creditors' meeting, Rede requested that creditors tell it informally which plan they prefer. Although the Ad Hoc Group and the Indenture Trustee chose not to participate in the informal poll, a majority of the remaining creditors indicated a preference for the Brazilian Reorganization Plan given its superior recoveries for unsecured creditors.

30.    At the second court-supervised creditors' meeting, the secured creditor class voted in favor of the Brazilian Reorganization Plan sponsored by Energisa. Having obtained a preliminary ruling from the Brazilian Bankruptcy Court that the Indenture Trustee

---

[4]    Section 7.1.4 of the Brazilian Reorganization Plan provides that the form of consideration chosen by the majority in principal amount of the Noteholders indicating their preference of consideration will govern the form of consideration provided to all holders of Perpetual Notes. After the Brazilian Reorganization Plan was approved, Rede solicited the preferences of the Noteholders pursuant to the Brazilian Reorganization Plan and in accordance with United States securities laws. The Noteholders overwhelmingly chose the cash payment option. Thus, all holders of Perpetual Notes will receive under the Brazilian Reorganization Plan payment of 25% of their claims in cash at on the closing date in exchange for the assignment of their Perpetual Notes to Energisa, subject to and in accordance with the Brazilian Reorganization Plan.

13

could vote, the Indenture Trustee voted to reject the Brazilian Reorganization Plan on behalf of all Noteholders—including those Noteholders who did not direct or authorize the Indenture Trustee to vote on their behalf. Members of the Ad Hoc Group also appeared at the meeting and participated fully in the voting and approval process. Although the Brazilian Reorganization Plan received the affirmative vote of a majority of the voting members of the class of secured creditors, as required under Brazilian law, the class of unsecured creditors, including the negative vote of the Indenture Trustee, narrowly voted to reject the Brazilian Reorganization Plan.

31.    Rede, however, sought reconsideration of the Brazilian Bankruptcy Court's initial decision to allow the Indenture Trustee to vote on behalf of those Noteholders from whom it did not receive direction or authorization. On September 9, 2013, the Brazilian Bankruptcy Court issued an opinion reconsidering and amending its initial decision, finding that upon closer review of the terms of the Indenture, the Indenture Trustee did not have the power, without the consent of each Noteholder, to effect any alteration to the values, charges, conditions, or maturity dates of all of the Perpetual Notes. As a result of excluding the Indenture Trustee's vote, the Brazilian Bankruptcy Court determined that a majority of the unsecured creditors had accepted the Brazilian Reorganization Plan. The Brazilian Bankruptcy Court also ruled that the Brazilian Reorganization Plan had met the requirements under the Brazilian Bankruptcy Law and entered an order approving the Brazilian Reorganization Plan on September 9, 2013, which was clarified by a subsequent order on November 14, 2013 (as clarified, the "Brazilian Confirmation Order").

32.    Eleven appeals of the Brazilian Confirmation Order were filed prior to the December 2, 2013 deadline for such appeals. The Appellate Court has issued several orders denying all requests for a stay of the Brazilian Confirmation Order pending the appeal. Thus,

14

although subject to appeals, the Brazilian Reorganization Plan and Brazilian Confirmation Order are in full force and effect.

33.    Rede expects all conditions precedent to consummation of the Brazilian Reorganization Plan will be satisfied or waived by the middle of February 2014.  Importantly, the Brazilian Reorganization Plan has already received the requisite approval of the Brazilian antitrust authorities and ANEEL has approved the ANEEL Plan relating to Energisa's investment in, and the operation and reorganization of, Rede's operating subsidiaries.

34.    The approved Brazilian Reorganization Plan contemplates the filing of this chapter 15 case.  See Plan at § 4.13 ("Rede Energia shall file a bankruptcy proceeding based on Chapter 15 of the U.S. Bankruptcy Code . . . .").  On December 2, 2013, the board of directors of Rede duly authorized José Carlos Santos, Rede's attorney in fact, to act as Rede's foreign representative and commence this chapter 15 case (the "Resolution of Appointment").

**Relief Requested**

35.    The Petitioner requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto and pursuant to sections 105(a), 1507(a), 1509(b), 1515, 1517, 1520, 1521(a) and 1525(a) of the Bankruptcy Code, that:

a)  grants the Verified Petition Form in this case and recognizes the Brazilian Bankruptcy Proceeding as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code;

b)  recognizes the Petitioner as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the Brazilian Bankruptcy Proceeding;

c)  gives full force and effect and grants comity in the United States to the Brazilian Confirmation Order;

d)  authorizes and directs the Indenture Trustee and the DTC to take any and all actions necessary to give effect to the terms of the Brazilian Reorganization Plan;

e)  permanently enjoins all parties from commencing or taking any action in the United States to obtain possession of, exercise control over, or assert claims against the

15

Debtor or its property; and

f) grants such other and further relief as the Court deems just and proper.

## Basis for Relief

A. **The Court Should Recognize the Brazilian Bankruptcy Proceeding as a Foreign Main Proceeding and the Petitioner as its Foreign Representative**

36.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code. See In re Overnight & Control Comm'n of Avánzit, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). As explained below, venue in this District is proper, and the Brazilian Bankruptcy Proceeding, the Petitioner and this Petition satisfy all of the section 1517(a) requirements. Rede is eligible to be a debtor under chapter 15 of the Bankruptcy Code and has assets in the United States in this District in accordance with section 109(a) of the Bankruptcy Code. See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), No. 13-612, 2013 WL 6482499 (2d Cir. Dec. 11, 2013).

1. **The Court has Jurisdiction to Recognize the Brazilian Bankruptcy Proceeding and Grant the Relief Requested**

37.     Pursuant to sections 157(b)(2)(P) and 1334 of title 28 of the United States Code and the Amended Standing Order, the Court has jurisdiction to hear and determine chapter 15 cases.

38.     Venue is also proper in this District. As described above, the Debtor's sole property in the United States are the funds held in the Client Trust Account located in New York, New York. The Debtor has no employees or operations in the United States and is not a

MIAMI 990724

party to any lawsuits in the United States. The Debtor has no United States affiliates or equity-holders. The Debtor's principal connection to the United States is that it issued the Perpetual Notes pursuant to the Indenture, which is governed by New York law. Petitioner Decl. ¶ 18. Aside from the holders of Perpetual Notes, many of whom are sophisticated financial institutions with offices in New York, and the Indenture Trustee, which is headquartered in New York, the Debtor is aware of only one creditor that is residing in the United States: the Inter-American Development Bank, which is headquartered in Washington, D.C. Because of the proximity to the Court of the Debtor's United States creditors and United States counsel, the existence of the Perpetual Notes governed by New York law, and the fact that the Debtor is not a party to litigation in any other United States jurisdiction, the Debtor believes that the interests of justice are served by establishing venue in this District. Accordingly, the Petitioner respectfully submits that venue in this District is consistent with the interests of justice and the convenience of the parties and is proper pursuant to sections 1410(1) and 1410 (3) of title 28 of the United States Code.

### 2.    The Brazilian Bankruptcy Proceeding Is a Foreign Main Proceeding

39.    The Brazilian Bankruptcy Proceeding[5] is a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.

40.    First, the Brazilian Bankruptcy Proceeding comes within the general definition of "foreign proceeding" as set forth in section 101(23) of the Bankruptcy Code.[6] Section 101(23) requires that a "foreign proceeding" be (1) a collective judicial or administrative

---

[5]    On December 19, 2012, the Brazilian Bankruptcy Court entered an order authorizing the commencement of the Brazilian Bankruptcy Proceeding pursuant to the Brazilian Bankruptcy Law (the "Commencement Order"), a certified copy of which is attached to the Petitioner Declaration as Exhibit "B" and a certified translation of which is attached to the Petitioner Declaration as Exhibit "C".

[6]    "'[F]oreign proceeding' means a collective judicial . . . proceeding in a foreign country . . . under a law relating to insolvency or adjustment of debt [and where] the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization." 11 U.S.C. § 101(23).

17

proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3)

under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the

assets and affairs of the debtor.  See 11 U.S.C. § 101(23).  The Bankruptcy Code defines

"foreign court" as "a judicial or other authority competent to control or supervise a foreign

proceeding."  See 11 U.S.C. § 1502(3).  Because it is a judicial proceeding brought under the

Brazilian Bankruptcy Law and supervised by the Brazilian Bankruptcy Court, the Brazilian

Bankruptcy Proceeding fits squarely within the Bankruptcy Code's definition of a "foreign

proceeding."

   41. Bankruptcy courts, including this Court, have specifically held that

restructuring proceedings under the Brazilian Bankruptcy Law and other Brazilian insolvency

laws are foreign proceedings.  See, e.g., Centrais Elétricas Do Pará S.A., No. 12-14568 (SCC)

[Docket No. 19] (Bankr. S.D.N.Y. Dec. 12, 2012) (recognizing, as a foreign main proceeding, a

case filed by a former subsidiary of the Debtor pursuant to the in-court reorganization section of

the Brazilian Bankruptcy Law); In re Independência S.A., No. 09-10903 [Docket No. 23]

(Bankr. S.D.N.Y. Mar. 26, 2009) (recognizing, as a foreign main proceeding, a case filed

pursuant to the in-court reorganization section of the Brazilian Bankruptcy Law); In re

VarigLogística S.A., No. 09-15717 [Docket No. 77] (Bankr. S.D. Fla. May 11, 2009) (same); see

also In re ITSA Intercontinental Telecomunicações Ltda., No. 08-13927 [Docket No. 16]

(Bankr. S.D.N.Y. Jan. 29, 2009) (recognizing a foreign Brazilian bankruptcy proceeding that

confirmed a pre-negotiated plan of reorganization); In re Enco ZolcsakEquipamentos Industriais

Ltda., No. 1122924 [Docket No. 15]  (Bankr. S.D. Fla. July 12, 2011); In re Transbrasil S.A.

Linhas Aéreas, No. 11-19484 [Docket No. 9] (Bankr. S.D. Fla. May 11, 2011); In re Banco

Santos, S.A., No. 10-47543 [Docket No. 9] (Bankr. S.D. Fla. Jan. 2011); In re Fazendas

MIAMI 990724

Reunidas Boi Gordo, S.A., No. 09-37116 [Docket No. 7] (Bankr. S.D. Fla. Jan. 11, 2010).

   42. Second, the Brazilian Bankruptcy Proceeding qualifies as a "foreign main

proceeding." A "foreign main proceeding" is defined in the Bankruptcy Code as a "foreign

proceeding pending in the country where the debtor has the center of its main interests." 11

U.S.C. § 1502(4). The Bankruptcy Code neither defines nor provides a conclusive test for

determining the location of a debtor's center of main interests ("COMI"). However, "[i]n the

absence of evidence to the contrary," there is a statutory presumption that a debtor's "registered

office" is its COMI. See 11 U.S.C. § 1516(c). To determine a debtor's COMI, the Court of

Appeals for the Second Circuit recently held that "the relevant principle is that the COMI lies

where the debtor conducts its regular business, so that [it] is ascertainable by third parties . . . .

Among other factors that may be considered are the location of headquarters, decision-makers,

assets, creditors, and the law applicable to most disputes." Morning Mist Holdings Ltd. v. Krys

(In re Fairfield Sentry Ltd.), 714 F.3d 127, 130 (2d Cir. 2013); see also In re British Am. Ins.

Co., 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be

readily ascertainable by third parties."); In re Ran, 390 B.R. 257, 266 (Bankr. S.D. Tex. 2008)

("A debtor's centre of main interests must be identified by reference to criteria that are both

objective and ascertainable by third parties.") (internal quotation marks omitted) (citing

European Council Regulation No. 1346/2000 of 29 May 2000).

   43. The COMI for the Debtor's enterprise is the City of São Paulo, State of

São Paulo, Brazil. The Debtor is operationally and functionally centered in the State of São

Paulo, largely organized under centralized senior management in the State of São Paulo, and

subject to combined cash management and accounting functions, all of which are based in the

State of São Paulo. Petitioner Decl. ¶ 42. Indeed, among other connections to Brazil:

MIAMI 990724

(a)     all of the Debtor's operations are managed and directed from its head office in São Paulo, Brazil, and are carried out in the State of São Paulo;

(b)     corporate governance for the Debtor is directed from São Paulo, Brazil;

(c)     in-person meetings of the Debtor's Board of Directors are typically held in São Paulo, Brazil;

(d)     a majority of the members of the Debtor's Board of Directors maintain their offices in São Paulo, Brazil;

(e)     strategic and key operating decisions and key policy decisions for the Debtor are made by staff located in São Paulo, Brazil;

(f)     the Debtor's corporate accounting, accounts payable, insurance procurement, accounts receivable, financial planning, internal auditing, marketing, treasury, real estate, research & development and tax services are provided from São Paulo, Brazil;

(g)     the Debtor's finance, legal, human resources, payroll, billing, freight management, procurement and engineering services are carried out in São Paulo, Brazil;

(h)     the Debtor's cash management functions are maintained and directed from São Paulo, Brazil;

(i)     key information technology and systems used by the Debtor are provided from São Paulo, Brazil;

(j)     management and senior staff of the Debtor regularly attend meetings in São Paulo, Brazil;

(k)     the chief executive officer that oversees financial management of the Debtor is based in São Paulo, Brazil;

(l)     capital expenditure decisions affecting the Debtor are managed in São Paulo, Brazil;

(m)     the majority of the Debtor's creditors, both in number and amount, (excepting the Noteholders) are located in Brazil; and

(n)     the Debtor's equityholders are located in Brazil.

Id. at ¶ 42.

44.     Other than this chapter 15 case and the Brazilian Bankruptcy Proceeding, the Debtor is not subject to insolvency proceedings in any jurisdiction.

45.     Thus, based on the facts present in this case, the Petitioner respectfully

20

MIAMI 990724

submits that São Paulo, State of São Paulo, Brazil should be held to be the center of the Debtor's

main interests. See In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006)

(noting that a debtor's COMI is the "place where the debtor conducts the administration of his

interests on a regular basis and is therefore ascertainable by third parties"). Accordingly, given

that the Brazilian Bankruptcy Proceeding is pending in the Debtor's COMI, the Brazilian

Bankruptcy Proceeding should be recognized as a foreign main proceeding pursuant to section

1517(b)(1) of the Bankruptcy Code.

### 3.    The Petitioner is a Proper "Foreign Representative"

46.    The second requirement for recognition of a foreign main proceeding

under section 1517(a) of the Bankruptcy Code is that a foreign representative applying for

recognition be a person or body. See 11 U.S.C. § 1517(a)(2). Section 101(24) of the Bankruptcy

Code provides that

> The term "foreign representative" means a person or body, including a person or
> body appointed on an interim basis, authorized in a foreign proceeding to
> administer the reorganization or the liquidation of the debtor's assets or affairs or
> to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

47.    Here, the Petitioner in this case is an individual who has been duly

appointed by the Debtor's board of directors to act as the foreign representative in accordance

with section 101(24) of the Bankruptcy Code and commence this chapter 15 case.[7] As explained

in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law authorizes the Debtor to

administer the reorganization of its assets and affairs.[8] Brazilian Counsel Decl. ¶ 12. As such,

---

[7]    A certified copy of the Resolution of Appointment authorizing and appointing José Carlos Santos to
commence this chapter 15 case and act as foreign representative is attached to the Petitioner Declaration as Exhibit
"H" and a certified translation to English is attached to the Petitioner Declaration as Exhibit "I".

[8]    Moreover, Section 4.13 of the Brazilian Reorganization Plan expressly contemplates that the Debtor
commence this chapter 15 case and authorizes the Debtor to take all necessary measures to implement the

21

the Petitioner satisfies section 1517(a)(2) of the Bankruptcy Code.

> **4.    The Petition was Properly Filed under Sections 1504 and 1509 and
> meets the Requirements of Section 1515**

48.    The third and final requirement for recognition of a foreign proceeding

under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the

procedural requirements of section 1515 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a)(3).

Here, all of those procedural requirements are satisfied.

49.    First, the Petitioner duly and properly commenced this chapter 15 case in

accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing a petition with all

the documents and information required by sections 1515(b) and 1515(c).  See In re Bear Stearns

High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 127 (Bankr. S.D.N.Y.

2007) ("A case under chapter 15 is commenced by a foreign representative filing a petition for

recognition of a foreign proceeding under section 1515 of the Bankruptcy Code."), aff'd, 389

B.R. 325 (S.D.N.Y. 2008).

50.    Second, in accordance with section 1515(b)(1)-(2) and (d) of the

Bankruptcy Code, the Petitioner has submitted evidence, translated into English, of the existence

of the Brazilian Bankruptcy Proceeding and the appointment of the Petitioner as foreign

representative thereof.  See Exhibits "B", "C", "H", "I", "F", and "G" to the Petitioner

Declaration (together containing true and correct copies of the Commencement Order, the

Resolution of Appointment and the Brazilian Confirmation Order, along with certified

translations of each from Portuguese to English).

51.    Finally, in accordance with section 1515(c) of the Bankruptcy Code,

---

assignment of the Perpetual Notes to Energisa.  See Brazilian Reorganization Plan at § 4.13 ("Rede Energia shall
file a bankruptcy proceeding based on Chapter 15 of the U.S. Bankruptcy Code for the purpose of granting effects to
the Plan in U.S. territory, binding the Creditors domiciled and organized therein . . . .").

MIAMI 990724

Exhibit 1 of the Verified Petition Form contains a statement identifying the Brazilian Bankruptcy

Proceeding as the only foreign proceeding currently pending with respect to the Debtor.  See

Verified Petition Form, Exhibit 1.

*      *      *

52.     For all of the reasons set forth above, the Petitioner respectfully submits

that all of the requirements of section 1517(a) have been satisfied and that Rede is entitled to all

of the relief provided by section 1520 of the Bankruptcy Code.[9]  Thus, the Court should enter the

Proposed Order attached here as Exhibit "A" recognizing the Brazilian Bankruptcy Proceeding

as a foreign main proceeding.

**B.     Discretionary Relief under Chapter 15 of Bankruptcy
Code Is Warranted and Appropriate**

53.     In addition to the relief automatically provided under section 1520 of the

Bankruptcy Code upon recognition of the Brazilian Bankruptcy Proceeding, the Petitioner

requests that this Court provide additional relief and assistance pursuant to sections 105(a),

1507(a) and 1521(a) of the Bankruptcy Code to further the goal of orderly administration of the

Debtor's assets.

54.     Upon recognition of a foreign proceeding and at the request of a foreign

representative, the Court may grant (with certain express exceptions not applicable here) "any

appropriate relief," including any injunctive relief and "any additional relief that may be

available to a trustee," that is necessary to effectuate the purpose of chapter 15 and to protect the

assets of the debtor or the interests of the creditors.  11 U.S.C. § 1521(a).  Such relief may

---

[9]     Upon recognition of the Brazilian Bankruptcy Proceeding as a foreign main proceeding, certain relief is
automatically granted as a matter of right, including a stay that enjoins actions against the Debtor and otherwise
protects the Debtor.  See 11 U.S.C. § 1520.  In particular, upon the Court's recognition of the Brazilian Bankruptcy
Proceeding as a foreign main proceeding, section 1520(a)(1) of the Bankruptcy Code triggers the automatic stay
provisions of section 362 of the Bankruptcy Code with respect to the Debtor.

23

"include," [10] among other relief:

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
>
> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
>
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) . . . ; and
>
> (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) . . . .

Id. The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

        55.     In granting discretionary relief, the Court may also act pursuant to section 1507 of the Bankruptcy Code to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other applicable U.S. law. 11 U.S.C. § 1507(a). The legislative history to section 1507 states that the section provides authority for "additional relief" beyond that permitted under section 1521 of the Bankruptcy Code. H.R. Rep. No. 109-31, pt. I, 109th Cong., 1st Sess. 109 (2005). In exercising discretion to grant relief under section 1507(a) of the Bankruptcy Code, courts are guided by the standards set forth in section 1507(b) of the Bankruptcy Code, which provides that:

---

[10]     The term "including" (as set forth in section 1521(a)) is not limiting. See 11 U.S.C. § 102(3).

MIAMI 990724

In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

> (1) just treatment of all holders of claims against or interests in the debtor's property;

> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

> (3) prevention of preferential or fraudulent dispositions of property of the debtor;

> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b). Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

56.    For the reasons that follow, the Petitioner requests that this Court assist in the implementation of the Brazilian Reorganization Plan and the Brazilian Confirmation Order by exercising its discretion under sections 105(a), 1507(a) and 1521(a) of the Bankruptcy Code.

### 1. Specific Request for Additional Relief Pursuant to Sections 105(a), 1507(a) and 1521(a) of the Bankruptcy Code

#### a. Assistance with Implementing the Brazilian Reorganization Plan

57.    Pursuant to sections 105(a), 1507(a) and 1521(a) of the Bankruptcy Code, the Petitioner seeks additional assistance from the Court in authorizing and directing the Indenture Trustee and the DTC to carry out all administrative actions required of them pursuant to the Brazilian Reorganization Plan and Brazilian Confirmation Order or that are necessary to consummate the terms of the Brazilian Reorganization Plan and Brazilian Confirmation Order.

58.    As described in the Petitioner Declaration, pursuant to the Brazilian

MIAMI 990724

Reorganization Plan and the Brazilian Confirmation Order, Energisa will pay the Indenture

Trustee cash equal to 25% of the principal amount of the claim attributable to the Perpetual

Notes for distribution to the Noteholders in exchange for the assignment of the complete

beneficial interest in the Perpetual Notes to Energisa.[11] The Brazilian Reorganization Plan

further provides that upon Energisa making such payment to the Indenture Trustee, the complete

beneficial interest in the Perpetual Notes from the Noteholders will be considered transferred to

Energisa by operation of Brazilian law, and the Noteholders, Indenture Trustee, Rede and

Energisa are required to take all necessary measures to implement such assignment. See

Brazilian Reorganization Plan at § 7.4.1.

59.    Rede believes that the Indenture Trustee and the DTC (i.e., the record

holder of the global note representing all of the Perpetual Notes) may assert that they are not

subject to Brazilian Bankruptcy Court jurisdiction and, as such, may resist paying the current

beneficial owners of the Perpetual Notes their distributions under the Brazilian Reorganization

Plan and formally assigning the global Perpetual Note to Energisa without first obtaining an

order from a U.S. court directing and authorizing such actions.  To consummate the foregoing

transactions provided in the Brazilian Reorganization Plan, the Petitioner seeks assistance from

the Court in authorizing and directing the Indenture Trustee and the DTC to take all actions

necessary to promptly (i) remit the payment received by the Indenture Trustee from Energisa to

the beneficial owners of the Perpetual Notes and (ii) memorialize and mechanically implement

---

[11]     As noted above, Rede's unsecured creditors were given the choice under the Brazilian Reorganization Plan
between the 25% cash option and receiving new notes maturing in twenty-two (22) years.  Petitioner Decl. ¶ 31.
Section 7.1.4 of the Brazilian Reorganization Plan provides that the form of consideration chosen by the majority in
principal amount of the Noteholders indicating their preference of consideration will govern the form of
consideration provided to all holders of Perpetual Notes.  After the Brazilian Reorganization Plan was approved,
Rede solicited the preferences of the Noteholders pursuant to the Brazilian Reorganization Plan and in accordance
with U.S. securities laws, and the Noteholders, indicating their preference, overwhelmingly chose the cash payment
option.

MIAMI 990724

the assignment of the Perpetual Notes to Energisa as contemplated by the Brazilian

Reorganization Plan.

      60.    By providing this relief, the Court will give clear direction and authority

under U.S. law to the Indenture Trustee and the DTC to carry out the requirements of the

Brazilian Reorganization Plan in accordance with Brazilian Bankruptcy Law and the Brazilian

Confirmation Order.  As noted above, this same relief was granted by this Court in the chapter

15 case of the Debtor's former subsidiary, CELPA.  Centrais Elétricas Do Pará S.A., No. 12-

14568 (SCC) [Docket No. 19] (Bankr. S.D.N.Y. Dec. 12, 2012).

      b.  Enforcement of the Brazilian Reorganization Plan in the United States

      61.    To the extent not otherwise stayed under sections 1520 and 362 of the

Bankruptcy Code, the Petitioner requests that the Court, in its discretion under section 1521 of

the Bankruptcy Code, enter a permanent injunction against any parties that may attempt to

commence prepetition or post-petition actions and/or claims in the United States against the

Debtor or its property.  Such an injunction will help ensure the fair and efficient administration

of the Brazilian Bankruptcy Proceeding, which aims to protect all parties in interest and to

require that all the Debtor's creditors be bound by the terms of the Brazilian Reorganization

Plan, as approved by the Brazilian Confirmation Order.

      62.    The Court of Appeals for the Second Circuit has recognized the need for

such an injunction under similar circumstances.  Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,

825 F.2d 709, 714 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property

requires assembling all claims against the limited assets in a single proceeding; if all creditors

could not be bound, a plan of reorganization would fail."); see also Cunard S.S. Co. v. Salen

Reefer Servs. AB, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign

proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic

manner, rather than in a haphazard, erratic or piecemeal fashion.").

63.     Similarly, the Supreme Court of the United States has long recognized the

necessity of giving effect to foreign schemes of arrangement in order to further these goals,

reasoning that

> [u]nless all parties in interest, wherever they reside, can be bound by the
> arrangement which it is sought to have legalized, the scheme may fail.  All home
> creditors can be bound.  What is needed is to bind those who are abroad.  Under
> these circumstances the true spirit of international comity requires that schemes of
> this character, legalized at home, should be recognized in other countries.

Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 539 (1883).

64.     Here, the Petitioner fears that certain creditors may seek judgments in the

United States against the Debtor or its property, seeking to obtain more than the pro rata

treatment to which they are entitled under the Brazilian Reorganization Plan.  If such creditors

can effectively evade the terms of the Brazilian Reorganization Plan and the Brazilian

Confirmation Order by commencing actions in the United States, the Debtor would be left to

defend against these suits, regardless of their merit.  This could deplete the resources of the

Debtor's restructured business and prejudice its reorganized value.  For these reasons, an

injunction would support implementation of the Brazilian Confirmation Order and the Brazilian

Reorganization Plan and would protect the interests of all of the Debtor's creditors in having

claims against the Debtor and its estate valued and paid on a consistent, non-discriminatory basis

as determined by the Brazilian Bankruptcy Court.

65.     Pursuant to section 1521(e) of the Bankruptcy Code, the federal law

standard for injunctive relief applies in chapter 15 cases.  See 11 U.S.C. § 1521(e).  Therefore, to

obtain a permanent injunction, a movant must demonstrate (1) that an injunction is required to

avoid irreparable harm and (2) that he will in fact win on the merits.  See NextG Networks of

28

N.Y., Inc. v. City of New York, No. 03 CIV 9672, 2006 WL 538189, at *8 (S.D.N.Y. Mar. 6, 2006).

66.     Irreparable harm exists where the orderly determination of claims against a debtor and the fair distribution of a debtor's assets are disrupted. E.g., Salen Reefer Servs. A.B., 773 F.2d at 458 ("Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail.") (citing Canada S. Ry. Co., 109 U.S. at 539); In re MMG LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("As a rule . . . irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors."); In re Banco Nacional de Obras y Servicios Publicos S.N.C., 91 B.R. 661, 664 (Bankr. S.D.N.Y. 1988) (same); see also In re Bird, 222 B.R. 229, 233 (Bankr. S.D.N.Y. 1998).  Moreover, courts have held that "the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury."  In re Rubin, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) (quoting In re Lines, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988)).

67.     Here, the Petitioner has every reason to believe that he will be successful on the merits in his request for recognition of the Brazilian Bankruptcy Proceeding as a foreign proceeding and, in any event, such recognition will occur simultaneously with or prior to the granting of any relief to the Petitioner pursuant to section 1521 of the Bankruptcy Code. Moreover, allowing creditors to litigate any claims based on the Perpetual Notes or other unsecured claims against the Debtor in the United States would threaten the success of the Brazilian Bankruptcy Proceeding and Brazilian Reorganization Plan and may divert funds needed to maximize the value of the Debtor's estate, which would constitute irreparable harm. See MMG LLC, 256 B.R. at 555; In re Gercke, 122 B.R. 621, 626 (Bankr. D.D.C. 1991).

29

68.     In addition, the injunctive relief sought herein would not cause undue
hardship or prejudice to the rights of any U.S. based creditors.  In fact, the Brazilian
Reorganization Plan and the voting procedures applied uniformly to all of the Debtor's creditors
wherever they resided, including all of the holders of Perpetual Notes, who were provided with
the opportunity to participate in the creditors meeting and voting process in accordance with
Brazilian Bankruptcy Law.  Petitioner Decl. ¶ 33.  In fact, members of the Ad Hoc Group
appeared at the creditors' meetings and participated fully and fairly in the approval and voting
process, as contemplated by Brazilian Bankruptcy Law.[12]  Id.  In short, due process has been,
and continues to be, preserved for all stakeholders in connection with the Brazilian Bankruptcy
Proceeding, and the injunctive relief sought herein does nothing more than give effect to the
Brazilian Confirmation Order and the Brazilian Reorganization Plan in the territorial limits of the
United States.

### 2.   The Relief Requested Herein is Consistent with the Goals of Chapter 15.

69.     The relief requested herein is founded on the congressional mandate that
United States courts should cooperate with foreign proceedings and foreign representatives to
promote the goals of chapter 15.  See 11 U.S.C. § 1525(a) ("Consistent with section 1501, the
court shall cooperate to the maximum extent possible with a foreign court or a foreign
representative, either directly or through the trustee.").  Moreover, the relief requested herein is
"appropriate," as that term is used in section 1521 of the Bankruptcy Code, because it is
necessary to ensure the success of the Brazilian Bankruptcy Proceeding and Brazilian

---

[12]     As explained in the Petitioner Declaration, the Brazilian Reorganization Plan received the affirmative vote
of a majority of the voting members of the class of secured creditors, as required under Brazilian law.  The class of
unsecured creditors narrowly voted to reject the Brazilian Reorganization Plan.  However, pursuant to Brazilian law,
the Brazilian Reorganization Plan was crammed down on the unsecured class of creditors because, inter alia, all
other classes approved the plan and creditors holding more than one-third (1/3) of the amount of allowed claims
present at the creditors' meeting in the unsecured class of creditors voted to approve the plan.  See Brazilian Counsel
Decl. ¶¶ 20-22, 25.

MIAMI 990724

Reorganization Plan.

        a.  <u>Creditors and Other Parties in Interest will be Sufficiently Protected</u>

      70.    The Court may grant additional relief only if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (adopting Article 22 of U.N. Comm'n on Int'l Trade Law, Cross-Border Insolvency: Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency, U.N. Doc. A/CN.9/442 (Dec. 19, 1997) (the "Model Law")).  Although the Bankruptcy Code does not define "sufficient protection," the legislative history indicates that the prohibition applies where "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005).

      71.    A determination of sufficient protection "'requires a balancing of the respective parties' interests." <u>In re AJW Offshore, Ltd.</u>, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) (citing <u>SNP Boat Serv. S.A. v. Hotel Le St. James</u>, 483 B.R. 776, 784 (S.D. Fla. 2012); <u>In re Qimonda AG Bankr. Litig.</u>, 433 B.R. 547, 556–58 (E.D. Va. 2010); <u>CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.</u>, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012)); <u>Tri–Cont'l Exch.</u>, 349 B.R. at 637 ("The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief.  This balance is essential to achieve the objectives of cross-border insolvency legislation."); Model Law at ¶ 161; <u>see also</u> <u>In re Sivec SRL</u>, 476 B.R. 310, 323 (Bankr. E.D. Okla. 2012) (citing Model Law).  Section 1522 "gives the bankruptcy court broad latitude to mold relief to meet specific circumstances." <u>Int'l Banking</u>, 439 B.R. at 626-27 (internal quotations and citations omitted); <u>In re Atlas Shipping A/S</u>, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009).

31

72.     Here, the Debtor's creditors are "sufficiently protected" by the treatment afforded to them under the Brazilian Reorganization Plan and the process by which the Brazilian Reorganization Plan was approved.  The U.S. claimants, for example, are not being subjected to undue inconvenience or prejudice.  Rather, the Brazilian Reorganization Plan is treating all similarly situated creditors equally and is distributing consideration under the Brazilian Reorganization Plan in a manner substantially similar to what might occur under U.S. law.  See Atlas Shipping, 404 B.R. at 740.  The relief requested herein "would [also] assist in the efficient administration of this cross-border insolvency proceeding, and it would not harm the interests of the debtors or their creditors."  In re Grant Forest Prods., Inc., 440 B.R. 616, 621 (Bankr. D. Del. 2010).  That certain creditors "may be denied an advantage over the debtor's other . . . creditors is not a valid reason to deny relief to the foreign representative."  Atlas Shipping, 404 B.R. at 742.

b.  The Relief Requested is Not Manifestly Contrary
to the Public Policy of the United States

73.     The Court may deny a request for any relief that would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  The legislative history indicates that the "public policy" exception is narrow, applying only to the "most fundamental policies of the United States."  H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 109 (2005).  Importantly, it is unnecessary that the result achieved in a foreign proceeding be identical to what could be obtained in the United States.  Rather, "[t]he key determination . . . is whether the procedures used [in the foreign proceeding] meet our fundamental standards of fairness."  In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010).  As such, a foreign representative should not be denied comity simply because the relief obtained in the foreign proceeding under the applicable law of that country would not be available in the United States.

32

See In re Condor Ltd., 601 F.3d 319, 327 (5th Cir. 2010).

74.    Furthermore, chapter 15 was drafted to incorporate the Model Law.

Section 1501(a) of the Bankruptcy Code provides, in pertinent part, that:

> The purpose of this chapter is to incorporate the [Model Law] so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of -
>
> cooperation between -
>
> * * *
>
>     (A)    the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> * * *
>
> (2)    fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; [and]
>
> (3)    protection and maximization of the value of the debtor's assets.

11 U.S.C. § 1501.

75.    Here, the Brazilian Bankruptcy Proceeding and Brazilian Reorganization

Plan are consistent with the public policy of the United States. Indeed, the relief obtained by

Rede under the Brazilian Bankruptcy Law and now requested in the chapter 15 is nearly identical

to the relief afforded to debtors under chapter 11 of the Bankruptcy Code. Confirmed chapter 11

plans, for example, routinely permanently enjoin claims against a debtor and its successor(s) that

have been discharged under a plan of reorganization. Moreover, U.S. courts regularly direct

parties to take necessary actions to carry out transactions contemplated by the plan on behalf of

the estate.[13] Thus, the requested relief that the Indenture Trustee and DTC be authorized and

---

[13]    Section 1142(b) of the Bankruptcy Code, for example, states that

> court[s] may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of

33

directed to take any actions necessary for the consummation of the Brazilian Reorganization Plan, including the transfer of the Perpetual Notes to Energisa, would be available in chapter 11 cases and therefore should be granted here.

76.     In addition, like a proceeding under chapter 11, the Brazilian Bankruptcy Proceeding provides for a centralized process to assert and resolve claims against the estate in one tribunal, the Brazilian Bankruptcy Court, and to provide distributions to creditors in order of priority.  See Brazilian Counsel Decl. at ¶ 25.  Thus, as required by the Model Law (and as incorporated in chapter 15), granting the relief requested here would foster cooperation between courts in Brazil and the United States.  For instance, by granting the relief requested here, this Court would be assisting the Brazilian Bankruptcy Court in the orderly administration of the Debtor's assets by enjoining creditors from commencing or continuing actions against the Debtor or its assets in the United States and by giving the Indenture Trustee and the DTC the power that they believe they need to carry out their duties.

77.     For these reasons, the Brazilian Bankruptcy Proceeding is patently fair and comports with the United States' standards of fundamental fairness and with United States public policy.  Accordingly, the relief requested here should be granted.

### c.  Granting the Relief Requested Meets the Traditional Standards of "Comity" Under Section 1507(b)

78.     The Petitioner submits that granting the above-referenced relief further meets the standards of comity set forth in section 1507(b) of the Bankruptcy Code.

79.     The first factor under section 1507(b) is whether the additional assistance

---

any lien, that is necessary for the consummation of the plan.

11 U.S.C. § 1142(b).

34

contemplated will reasonably assure "just treatment of all holders of claims against or interests in the debtor's property." 11 U.S.C. § 1507(b)(1). Under former section 304(c) jurisprudence, courts uniformly held that this requirement is satisfied where the foreign insolvency law provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all of the estate's creditors in one proceeding. See, e.g., The Bank of New York v. Treco (In re Treco), 240 F.3d 148, 158 (2d Cir. 2001); In re Culmer, 25 B.R. 625, 629 (Bankr. S.D.N.Y. 1992).

80.      As described in greater detail in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law provides for a comprehensive procedure for the orderly and fair resolution of claims and the equitable distribution of assets among all of the estate's creditors in a single proceeding. Brazilian Counsel Decl. at ¶ 25. Upon an objection from any creditor, the judge must convene a general meeting of the creditors, at which three classes of creditors are formed: labor, secured creditors and unsecured creditors. Id. at ¶¶ 17-20. The plan must be accepted by simple majority of the class of creditors made up of labor-related claims. Id. at ¶ 21. For non-labor-related claims, the plan must not only be approved by a simple majority of creditors present at the creditors' meeting, in number, in each respective class, but must also be approved by creditors holding more than 50% of the amount of the allowed claims present at the creditors' meeting, in each respective class. Id. If one class dissents, the plan may be crammed down upon the other two classes if certain requirements are satisfied, including that more than one third (1/3) of the creditors present at the creditors' meeting, in number, in the dissenting class, must have voted in favor of the plan and, cumulatively, creditors that hold more than one third (1/3) in amount of the allowed claims present at the creditors' meeting, in the dissenting class, must have voted in favor of the plan. Id. at ¶ 25. If more than one class dissents, the plan

35

may not be crammed down. Id. at ¶ 22. Creditors have the right to object to a proposed plan

within 30 days after the debtor has proposed it. Id. at ¶ 27. Moreover, the creditors may

manifest opposition to the plan, and propose amendments to it, during the creditors' meeting

until there is a final approval by the creditors. Id. Creditors may also seek reconsideration of a

plan. Id. Within the 5 days after the court confirms a plan, creditors may present to the court a

motion for clarification; and, within 10 days of confirmation, the creditors may file an

interlocutory appeal to the appellate court. Id. Creditors are given proper notice of every court

decision, and the deadlines for filing appeals count from the date in which creditors are notified,

by means of a publication in the official gazette, of each decision. Id. In addition, the judicially

appointed administrator provides additional oversight, ensuring accurate information is

disseminated to the creditors and that an action to declare the debtor bankrupt is taken when the

debtor defaults on its obligations under the plan of reorganization. Id. at ¶ 26.

       81.    The second factor requires "protection of claim holders in the United

States against prejudice and inconvenience in the processing of claims in such foreign

proceeding." 11 U.S.C. § 1507(b)(2). This factor is satisfied where creditors are given adequate

notice of timing and procedures for filing claims, and such procedure does not create any

additional burdens for a foreign creditor to file a claim. See, e.g., Treco, 240 F.3d at 158; In re

Petition of Hourani, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995).

       82.    Upon issuing the decision to accept a debtor's petition for judicial

reorganization under the Brazilian Bankruptcy Law, the Brazilian judge orders the publication of

the decision along with a list of creditors presented by the debtor in the Official Gazette.

Brazilian Counsel Decl. at ¶ 28. Creditors then have 15 days to submit proofs of their claims to

the judicial administrator without penalty. Id. Claims submitted after the 15 day period may be

36

accepted as a late claim, but in such a case, the creditors will have no voting rights in the general meeting of creditors, may be subject to fees, and will not be able to receive any dividends occurring before the filing of the late claim to similarly situated creditors who filed timely claims. Id. The judicial administrator prepares and publishes a second list of creditors, based on the information provided by the debtor and contained in the proofs of claims.    Id. Within 10 days from the publication of such list, the debtor, the creditors and other stakeholders may present their objections to such list. Id. The court then decides on the objections and orders the consolidation of the final list of creditors and claims. Id. Foreign creditors have the same status as local creditors in the proceedings and enjoy the same rights and protections under the Brazilian Bankruptcy Law and are also subject to the same timing and procedures for filing their claims. Id. at ¶ 29. In addition, the plan of reorganization may not convert claims in a foreign currency to Brazilian reais without the specific consent of each affected creditor. Id.

83.    The third factor enumerated in section 1507(b) of the Bankruptcy Code requires that the "additional assistance" being considered will reasonably assure prevention of preferential or fraudulent dispositions of property of the Debtor. Under the Brazilian Bankruptcy Law, if such debtor is declared bankrupt, then any creditor, the Brazilian public attorney's office or the judicial administrator appointed by the court may bring actions to avoid transfers made to third parties with the intention to harm creditors or damage the debtor's estate. Id. at ¶ 29. The court may also declare such transfers void sua sponte unless the intent to defraud is a disputed question of fact, in which case an action must be commenced by one of the parties above. Id. at ¶ 29. Some transfers are subject to avoidance, within a bankruptcy liquidation proceeding, as a matter of law if they were made during the legal term, which is a period, beginning not more than 90 days before the petition or the date of the first protest by a creditor on account of the

MIAMI 990724

debtor's default and ending on the petition date, set by the judge during which such transfers by the debtor are subject to scrutiny. Such transfers include payments of debts not yet due, payments of debts that were due but were enforceable in any way not provided for in the agreement memorializing the debt, the creation of liens or any other in rem property interest in connection with a previously incurred debt. Id. at ¶ 30.

84.     The fourth factor requires that the distribution of the Debtor's property substantially accords with the order of distribution available under the Bankruptcy Code. See, e.g., In re Gee, 53 B.R. 891, 904 (S.D.N.Y. 1985); see also Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007 (D.C. Cir. 1999) (Taiwanese distribution system was substantially in accordance with U.S. law because priority afforded to certain classes of claims as under the Bankruptcy Code). Simply put, that section merely requires that the "foreign distribution scheme be 'substantially in accordance' with United States bankruptcy law; it does not have to mirror the United States distribution rules." In re Ionica, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) (citations omitted).

85.     The distribution scheme under the Brazilian Bankruptcy Law substantially accords with the scheme under the Bankruptcy Code, including, most importantly, the priority for secured claims over unsecured claims. Brazilian Counsel Decl. at ¶ 32. In a liquidation proceeding, various administrative claims are paid, see id., followed by labor-related claims and then secured claims up to the value of the collateral securing the claims. Id. at ¶ 33. After secured claims are paid, then tax claims exclusive of fines receive payment, followed by other claims privileged under non-bankruptcy law. Id. Then, unsecured claims receive payment and, finally, claims subordinated by contract or law and claims by directors and shareholders not currently employed by the debtor receive lowest priority. Id. In a judicial reorganization, the

MIAMI 990724

claims of affected creditors are paid according to the provisions of the plan of reorganization. Id.
at ¶ 34. The plan of reorganization (i) may not provide a period longer than one year for the
payment of labor-related claims (the payment of labor-related claims of a strictly salary nature,
up to the limit of 5 minimum wages per worker, must be paid within 30 days); and (ii) may not
provide for the suppression or the replacement of any security interest, when the asset covered by
such security interest is disposed of, without the express approval of the relevant secured
creditor. Id.

86.    Finally, section 1507 of the Bankruptcy Code generally requires that any
determination of a request for assistance under chapter 15 be "consistent with principles of
comity . . . ." 11 U.S.C. § 1507. As the House Judiciary Committee noted in its report, "comity
is raised to the introductory language to make clear that it is the central concept to be addressed."
H. Rep. at 109, U.S. Code Cong. & Admin. News 2005, 88, 172; see also 11 U.S.C. § 1509(b)(3)
(Once recognition of a foreign proceeding is granted, "a court in the United States shall grant
comity or cooperation to the foreign representative."); Altas Shipping, 404 B.R. at 733 (granting
comity to orders in Danish proceeding).

87.    Principles of comity support the grant of the relief requested herein.
Federal courts generally extend comity "whenever the foreign court had proper jurisdiction and
enforcement does not prejudice the rights of United States citizens or violate domestic public
policy." See Salen Dry Cargo A.B., 825 F.2d at 713 (citing Hilton v. Guyot, 159 U.S. 113, 202-
03 (1895)); see also Salen Reefer Servs. A.B., 773 F.2d at 456-57; Atlas Shipping, 404 B.R. at
733. As noted above, particularly in the bankruptcy context, "American courts have long
recognized the need to extend comity to foreign bankruptcy proceedings," because "[t]he
equitable and orderly distribution of a debtor's property requires assembling all claims against

39

MIAMI 990724

the limited assets in a single proceeding; if all creditors could not be bound, a plan of

reorganization would fail." Salen Dry Cargo A.B., 825 F.2d at 713-14. Other courts have

similarly underscored the importance of extending comity to foreign bankruptcy proceedings.

See Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d. Cir. 1999); Maxwell

Commc'ns Corp., 93 F.3d at 1048; Salen Reefer Servs. A.B., 773 F.2d at 458; OUI Fin. LLC v.

Dellar, No. 12 Civ. 7744, 2013 WL 5568732, at * 5 (S.D.N.Y Oct. 9, 2013) (comity under New

York law should normally be extended to foreign restructuring proceedings if the foreign court is

of competent jurisdiction, and the proceedings are procedurally fair and do not contravene public

policy).

        88.    Indeed, comity should be withheld only when the recognition of foreign

proceedings would be adverse to the public policy interests of the United States. See Somportex,

Ltd. v. Phila. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971); Salen Reefer Servs. A.B.,

773 F.2d at 457 (citing Somportex, 453 F.2d at 435). American courts have consistently

recognized the interests of foreign countries in winding up the affairs of their own businesses.

See Salen Reefer Servs. A.B., 773 F.2d at 458; In re Gee, 53 B.R. at 901. As discussed above, in

this case, because the Brazilian Bankruptcy Proceeding is not contrary or prejudicial to the

interests of creditors in the United States, the doctrine of comity supports the granting of

permanent relief enforcing the Brazilian Bankruptcy Proceeding and the Brazilian Confirmation

Order under sections 105(a), 1507 and 1521 of the Bankruptcy Code.

### Notice

        89.    Notice of this Motion has been provided to: (a) all persons or bodies

authorized to administer foreign proceedings of the Debtor; (b) Marian Baldwin-Fuerst of

Chadbourne & Parke LLP, 30 Rockefeller Plaza New York, New York 10112, on behalf of the

Indenture Trustee; (c) the DTC, 55 Water Street - 1SL New York , New York, 10041; (d)

MIAMI 990724

Timothy DeSieno of Bingham McCutchen LLP, 399 Park Avenue New York, New York 10022-4689, on behalf of the Ad Hoc Group; (e) the Inter-American Development Bank, 1300 New York Avenue, N.W. Washington, D.C. 20577; and (f) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006 New York, New York 10014. In accordance with the form and manner set forth in the *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002(m) and (q) and 9007 for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice* (the "Application"), which was filed concurrently herewith, the Petitioner proposes to further notify creditors and parties in interest of the filing of the chapter 15 petition and his request for entry of the Proposed Order. In light of the relief requested herein, the Petitioner respectfully submits that no further notice of this Motion is necessary under the circumstances.

## No Prior Request

90.     No previous request for the relief requested herein has been made to this or any other court.

41

MIAMI 990724

## Conclusion

WHEREFORE, the Petitioner respectfully requests that the Court:  (a) enter the

Proposed Order, upon notice and a hearing, substantially in the form attached hereto as Exhibit

A, and (b) grant such other and further relief as may be just and proper.

Dated: New York, New York
       January 16, 2014

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Thomas MacWright

Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131-2352
(305) 371-2700

By:  /s/ John K. Cunningham
     John K. Cunningham
     Richard S. Kebrdle

*Attorneys for José Carlos Santos as Petitioner
and Foreign Representative*

42