**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------x

| | |
|---|---|
| In re: | In a Case Under Chapter 15 of the Bankruptcy Code |
| REDE ENERGIA S.A.,[1] | Case No. 14-10078 (SCC) |
| Debtor in a Foreign Proceeding. | |

--------------------------------------------------------------------------x

## MEMORANDUM DECISION GRANTING PLAN ENFORCEMENT RELIEF PURSUANT TO CHAPTER 15 OF THE BANKRUPTCY CODE

A P P E A R A N C E S:

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
By:     J. Christopher Shore, Esq.
          Thomas MacWright, Esq.

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:     John K. Cunningham, Esq.
          Richard S. Kebrdle, Esq.

*Attorneys for Foreign Representative, José Carlos Santos*

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022
By:     Timothy B. DeSieno, Esq.
          Mark W. Deveno, Esq.

*Attorneys for Ad Hoc Group of Rede Noteholders*

---

[1]     The last four digits of the Debtor's Brazilian Corporate Taxpayer Registration Number are 01-49.  The Debtor's executive headquarters are located at Avenida Paulista, 2439, 5th Floor, Cerqueira Cesar, City of São Paulo, State of São Paulo, Brazil.  The Debtor was formerly known as Caiuá Serviços de Eletricidade S.A. and Rede Empresas de Energia Elétrica S.A.

## TABLE OF CONTENTS

FACTUAL BACKGROUND ..................................................................................................1

   I.    The Rede Group .........................................................................................2

   II.   Rede Issues the Perpetual Notes .....................................................................4

   III.  Events Leading to the Brazilian Bankruptcy Proceeding ..................................5

   IV.  The Brazilian Bankruptcy Proceeding ..........................................................8

        A.   Competing Plans are Submitted ......................................................8

        B.   Creditors Vote on the Brazilian Reorganization Plan ...............................11

        C.   The Brazilian Reorganization Plan is Approved Via Cram-Down .........................13

   V.    The Terms and Provisions of the Brazilian Reorganization Plan ...................................15

        A.   Substantive Consolidation of the Rede Debtors.......................................16

        B.   Classification of Claims Generally.........................................................17

        C.   Treatment of Secured Claims ............................................................18

        D.   Treatment of Unsecured Claims.........................................................19

            1.   Treatment of Concessionaire Creditor Claims ...............................19

            2.   Treatment of Subsidiary Concessionaire Claims ...........................20

            3.   Treatment of General Unsecured Claims.....................................21

   VI.  The Foreign Representative Commences a Chapter 15 Proceeding in the United
        States .....................................................................................22

DISCUSSION ...................................................................................................24

   I.    Applicable Law ...........................................................................24

   II.   The Plan Enforcement Relief is Proper Under
       Section 1521 of the Bankruptcy Code............................................................29

III.    The Plan Enforcement Relief is Also Proper Under
Section 1507 of the Bankruptcy Code .................................................................32

    A.    Creditors Were Treated Justly in Brazil ................................................................33

    B.    There is No Prejudice to U.S. Creditors in the Processing of Claims in Brazil ......34

    C.    There Were No Preferential or Fraudulent Property Distributions in the
Brazilian Bankruptcy Proceeding ..........................................................................35

    D.    The Distribution of Proceeds Under the Brazilian Reorganization Plan Was
Substantially in Accordance with U.S. Law ...........................................................36

IV.    With Respect to Section 1506, the Brazilian Bankruptcy Proceeding Was Administered
in a Manner Consistent With U.S. Public Policy ............................................................37

    A.    The Marketing Process of the Rede Debtors' Assets, the Consolidation of the
Rede Debtors, and the Confirmation of the Brazilian Reorganization Plan
Did Not Violate Creditors' Due Process Rights and Were Not
Manifestly Contrary to U.S. Public Policy ..............................................................38

        1.    The Marketing Process of the Rede Debtors' Assets .......................................38

        2.    The Determination by the Brazilian Bankruptcy Court That the
Rede Debtors' Assets and Liabilities Could be Consolidated for
Plan Purposes ..................................................................................................40

        3.    The Voting Process and Approval of the Plan Through Cram-Down ..............42

    B.    The Distribution Scheme in the Brazilian Reorganization Plan is Not Manifestly
Contrary to U.S. Public Policy ...............................................................................46

    C.    Differing Treatment of Similarly Situated Creditors by the
Brazilian Reorganization Plan Was For a Valid Purpose and
Is Not Inconsistent With U.S. Law .........................................................................49

    D.    To the Extent That There is Disparate Treatment, Such Treatment is
Not Targeted at U.S.-Based Creditors and There is No Evidence of
Protection of Local Creditors to the Detriment of U.S.-Based Creditors ...............51

CONCLUSION .....................................................................................................................54

<u>**SHELLEY C. CHAPMAN**</u>
<u>**UNITED STATES BANKRUPTCY JUDGE**</u>

In this proceeding brought pursuant to chapter 15 of the Bankruptcy Code, José Carlos Santos, the Foreign Representative of Rede Energia S.A., seeks this Court's assistance, pursuant to sections 1507 and 1521, in enforcing the terms of Rede's Brazilian reorganization plan. Specifically, the Foreign Representative requests the following relief: (i) an order granting full faith and credit to (a) the Brazilian reorganization plan and (b) the Brazilian court order confirming the plan, including a continuation of the injunction of acts in the United States in contravention of the confirmation order, and (ii) an order authorizing and directing the Indenture Trustee for Rede's 11.125 percent perpetual notes and the Depository Trust Company to take the actions necessary to carry out the terms of the Brazilian reorganization plan, including making payments to Rede's noteholders.  Certain of Rede's noteholders object to the relief as being contrary to public policy of the United States and urge the Court to allow them to return to Brazil and negotiate for an improvement on the distribution they are to receive under the Brazilian reorganization plan.  These noteholders allege that what the Foreign Representative describes as a proceeding that indisputably comports with fundamental principles of U.S. bankruptcy law and civilized jurisprudence is in fact a wholesale trampling of their rights that was conceived of and executed by the Brazilian government and rubberstamped by the Brazilian bankruptcy court. While there are certainly aspects of the Brazilian proceeding that differ in form and substance from what might occur in the United States, the Court nonetheless concludes, for the reasons set forth herein, that Rede's Foreign Representative is entitled to the relief requested.

**FACTUAL BACKGROUND**

An understanding of the structure of Rede Energia S.A. ("<u>Rede</u>" or  the "<u>Debtor</u>"), the events leading to Rede's Brazilian bankruptcy proceeding (the "<u>Brazilian Bankruptcy</u>

1

Proceeding"), and the Brazilian Bankruptcy proceeding itself, including the terms of Rede's

reorganization plan and its treatment of Rede's creditors, is essential to the Court's consideration

and analysis of the relief requested by José Carlos Santos, the authorized foreign representative

of Rede (the "Foreign Representative") and the objections to such relief.  The uncontroverted

facts and summary of applicable Brazilian law set forth below are taken from (i) the Stipulation

of Facts for Purposes of a Hearing on the Objection by the Ad Hoc Group of Rede Noteholders

to Relief Related to Recognition of a Foreign Proceeding [Docket No. 26] ("Stipulation of Facts"

or "Fact Stip.") and (ii) the Stipulation of Brazilian Law for Purposes of a Hearing on the

Objection by the Ad Hoc Group of Rede Noteholders to Relief Related to Recognition of

Foreign Proceeding [Docket No. 27] ("Stipulation of Law" or "Law Stip.").[2]

## I.   The Rede Group

Rede is one of the largest electric power companies in Brazil; it is the parent company of

a group of operating and non-operating subsidiary entities (collectively, with Rede, the "Rede

Group").  (Foreign Representative's Petition for Recognition of Brazilian Bankruptcy

Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. § 105(a),

1507(a), 1509(b), 1515, 1517, 1520 and 1521) [Docket No. 2] (the "Petition") at 3.)  Through its

operating subsidiaries, the Rede Group distributes electricity to millions of customers throughout

Brazil, including customers in the States of São Paulo, Minas Gerais, Paraná, Mato Grosso, and

Tocantins.  (Petition at 3.)  By 2012, the Rede Group had become one of Brazil's largest

electricity distributors, providing electricity to 578 municipalities in seven states in Brazil,

serving approximately five million consumer units, 165 indigenous villages, and 787 rural

settlements.  (Fact Stip. at ¶ 1.)

---

[2]    The Stipulation of Facts and the Stipulation of Law were admitted into evidence at the hearing on May 9,
2014.

Five members of the Rede Group are debtors in the Brazilian Bankruptcy Proceeding

(collectively, the "Rede Debtors"), consisting of:

- Rede, an intermediate holding company, holding interests in fourteen subsidiaries;

- Empresa de Eletricidade Vale Paranapanema S.A. ("EEVP"), a holding company that is the direct parent and controlling shareholder of Rede;

- Denerge Desenvolvimento Energético S.A. ("Denerge"), another holding company that is the direct parent and controlling shareholder of EEVP and the indirect parent of Rede;

- Companhia Técnica de Comercialização de Energia ("CTCE"), an electricity-trading subsidiary of Rede; and

- QMRA Participações S.A., a subsidiary of Rede and the former intermediate holding company parent of Centrais Eléricas Do Pará S.A. ("CELPA").[3]

(Fact Stip. at ¶ 2.)

The Rede Debtors have eight electricity distribution operating subsidiaries, known as the

"Rede Concessionaires,"[4] that are not debtors in the Brazilian Bankruptcy Proceeding.[5]  (Fact

Stip. at ¶ 3.)  Rede holds the equity in the Rede Concessionaires, and substantially all of the Rede

Group's business activities are conducted through them.  The electricity distribution activities of

---

[3]    CELPA commenced judicial reorganization proceedings under Brazilian bankruptcy law in February 2012. (Fact Stip. at ¶ 13.)  On November 9, 2012, CELPA's foreign representative sought chapter 15 recognition in this Court of CELPA's Brazilian judicial reorganization proceeding as a foreign main proceeding, along with certain relief to enforce the confirmed plan of reorganization.  (Fact Stip. at ¶ 15.)  The plan enforcement relief sought by the foreign representative of CELPA was similar to the relief sought here and included a request that the indenture trustee and the Depository Trust Company be directed and authorized to take actions to assign the notes to the plan sponsor pursuant to CELPA's Brazilian plan of reorganization.  (Fact Stip. at ¶ 15.)  No party in interest challenged the chapter 15 relief sought by CELPA's foreign representative.  (Fact Stip. at ¶ 16.)  On December 12, 2012, this Court entered an order granting recognition and the requested plan enforcement relief.  *In re Centrais Elétricas Do Pará S.A. – EM Recuperação Judicial*, Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, Case No. 12-14568 (SCC) [Docket No. 19].  At the time the Court entered such order, transfer of the shares contemplated under CELPA's plan had already closed, and appeals of the order confirming CELPA's plan were pending with the Brazilian appellate courts.  (Fact Stip. at ¶ 17.)  As of March 17, 2014, such appeals were still pending in Brazil.  (Fact Stip. at ¶ 17.)

[4]    The Rede Concessionaires consist of the following eight electricity distribution subsidiaries: CEMAT, CELTINS, ENERSUL, Caiuá Distribuição de Energia S.A., Empresa Elétrica Bragantina S.A., Companhia Nacional de Energia Elétrica ("CNEE"), Companhia Força e Luz do Oeste, and Empresa de Distribuição de Energia Vale Paranapanema S.A.  (Fact Stip. at ¶ 10.)

[5]    Four other subsidiaries of Rede (that are not Rede Concessionaires) also are not debtors in the Brazilian Bankruptcy Proceeding.  (Fact Stip. at ¶ 3.)

the Rede Concessionaires are subject to extensive regulation by the Brazilian government

through various regulatory authorities, including Agência Nacional de Energia Elétrica

("ANEEL").  (Fact Stip. at ¶ 8.)

## II.    Rede Issues the Perpetual Notes

Pursuant to an indenture dated April 2, 2007 (the "Indenture"), Rede issued 11.125

percent notes in the aggregate principal amount of USD$400 million[6] that have no fixed final

maturity date and are not subject to any mandatory redemption provisions (the "Perpetual

Notes").  (Fact Stip. at ¶ 4.)  In September 2007, Rede exercised its right under the Indenture to

issue additional Perpetual Notes in the aggregate principal amount of USD$175 million.

Approximately USD$496 million of the Perpetual Notes remained outstanding as of the date of

the commencement of the Brazilian Bankruptcy Proceeding on November 23, 2012.  (Fact Stip.

at ¶ 4.)

The Perpetual Notes are general unsecured obligations of Rede and are not guaranteed by

any of Rede's operating subsidiaries or other affiliates.  (Fact Stip. at ¶ 5.)  The notes are held in

global note form (the "Global Note") with the Depository Trustee Company ("DTC").  The Bank

of New York Mellon is the indenture trustee for the Perpetual Notes (the "Indenture Trustee").

Interest payments on the Perpetual Notes historically have been made by Rede to the Indenture

Trustee in New York and have been distributed to the beneficial owners of the Perpetual Notes

(the "Noteholders") through DTC.  The Indenture and the Perpetual Notes are governed by New

York law.[7]  (Fact Stip. at ¶¶ 5-6.)

---

[6]    For the purposes of this decision, all amounts will be indicated in either U.S. Dollars ("USD$") or Brazilian
Real ("R$") and have not been converted except where specified.

[7]    The Indenture contains a permissive jurisdiction clause that would allow, absent a court order to the
contrary, any holder of the Perpetual Notes to commence an action in the United States against Rede to recover on
the Perpetual Notes.  (Fact Stip. at ¶ 6.)

The members of the Ad Hoc Group of Rede Noteholders (the "Ad Hoc Group") in the aggregate hold approximately 37 percent of the Perpetual Notes.  (Fact Stip. at ¶ 80.)  The members of the Ad Hoc Group are Merrill Lynch Pierce, Fenner & Smith Incorporated ("Merrill"); Finanzas Y Negocios Internacional Inc.; and multiple funds managed by Moneda Asset Management.  (Fact Stip. at 31 n.16.)  The majority of the members of the Ad Hoc Group are based in Latin America.  (Fact Stip. at ¶ 80.)  Only one of its members, Merrill (which holds approximately 8.1 percent of the Perpetual Notes), is based in the United States.  (Fact Stip. at ¶¶ 79-80; 5/9/14 Tr. at 23:19-24:4.)

## III.    Events Leading to the Brazilian Bankruptcy Proceeding

On August 29, 2012, the Brazilian government passed and published Provisional Measure No. 577 ("MP 577"),[8] which permitted ANEEL, among other things, to intervene and take operational control of an electricity distribution concessionaire "to ensure its proper performance and to ensure compliance with the relevant contractual, regulatory and legal standards."  (Fact Stip. at ¶ 18.)  MP 577 also provided that electricity distribution concessionaires are no longer permitted to commence judicial and extrajudicial restructuring proceedings under Brazilian bankruptcy law prior to termination of the concession.[9]  (Fact Stip.

---

[8]    MP 577 subsequently became Law 12,767/2012, which was published on December 27, 2012.  (Fact Stip. at n.6.)

[9]    The Legislative History of MP 577 explains that

> The electric power sector currently faces a situation of having a concessionaire under judicial intervention [*i.e.*, CELPA], on the verge of bankruptcy, making regulatory action that is within the power of the granting authority once this event occurs urgent.  Moreover, to keep any other similar situation from occurring, there is an urgent need to derogate from judicial and non-judicial reorganization of public electric power concessionaires (or permit holders), as it is understood conducting this type of reorganization by means of intervention, which the provisions of this measure seek to do, better suits the specific considerations of these public electric power concessionaires (or permit holders).

(Fact Stip. at ¶ 19 (citing Ex. F, a Correct Copy and Certified Translation of MP 577 and its official legislative history).)  The Ministério de Minas e Energia ("MME"), the Brazilian government's primary regulator of the power industry, issued a press release on August 31, 2012, which explained that the main objective of MP 577 was to give

at ¶ 19.)  Within two days of publication of MP 577, on August 31, 2012, ANEEL intervened

and seized operational control of the Rede Concessionaries.  (Fact Stip. at ¶ 22.)  Pursuant to MP

577, Rede was required to provide ANEEL with a plan, over which ANEEL had unilateral

approval rights, to correct the failures and infractions that led to ANEEL's intervention and

which demonstrated Rede's economic and financial viability (the "Correctional Plan").  (Fact

Stip. at ¶ 27.)  In order to lift its intervention, ANEEL required that the Rede Debtors adequately

capitalize the Rede Concessionaires to ensure the provision of electric service to consumers.

(Fact Stip. at ¶¶ 24-27.)

The Ad Hoc Group alleges that (i) the timing of MP 577's passage; (ii) the timing of the

seizure of the Rede Concessionaires by ANEEL; (iii) the treatment of FI-FGTS's claim (defined

and discussed below); and (iv) the end result for creditors of the Rede Concessionaires (who

were not forced to restructure claims in bankruptcy) suggest that the protection of local interests

may have been involved in both the passage of MP 577 and in ANEEL's activities.  The Rede

Debtors dispute such allegations and believe the evidence is to the contrary.  (Fact Stip at ¶ 24.)

Following ANEEL's intervention, the Rothschild Group ("Rothschild"), whom Rede had

previously hired as its financial advisor, began marketing the shares of the Rede Group while

calling for any purchaser to make a capital injection in the Rede Concessionaires and pay an

additional amount that could be used to fund distributions to the creditors of the Rede Debtors.

(Fact Stip. at ¶¶ 26-29.)  Rothschild received two binding offers by the October 11, 2012

deadline, and Rede selected the joint bid submitted by CPFL Energia ("CPFL") and Equatorial

---

more security to the energy supply in Brazil, and MP 577's rules regarding intervention "were inspired by the
practices applicable to the financial system, another sector that deserves special attention from regulators and the
[Brazilian government], for its relevance in the life of the citizen and Brazilian economy."  (Reply at ¶ 20 (citing
Exhibit G, a certified translation of the MME Press Release).)

Energia ("<u>Equatorial</u>," and together with CPFL, "<u>Equatorial-CPFL</u>").[10]  (Fact Stip. at ¶ 30.)

Rede also developed a Correctional Plan that was submitted to ANEEL on October 26, 2012.[11]

(Fact Stip. at ¶ 31.)

On November 22, 2012, Fundo de Investimento do Fundo de Garantia por Tempo de

Serviço ("<u>FI-FGTS</u>"), an investment fund wholly-owned by an employee severance payment

guarantee fund created by the Brazilian government, exercised a "put" right under its 2010

investment agreement with Rede.  (Fact Stip. at ¶¶ 64-65.)  Pursuant to the investment

agreement, FI-FGTS held 37.1 percent of the shares of EEVP and a right to "put" such shares to

Denerge[12] in return for a secured debt claim.  Accordingly, by exercising its put right one day

before the Rede Debtors filed for bankruptcy in Brazil, FI-FGTS obtained a secured claim

against Denerge, one of the Rede Debtors, in an amount of R$712.5 million.  (Fact Stip. at ¶ 66.)

As further described below, the Ad Hoc Group contends that, as of the petition date, FI-FGTS

remained a shareholder and should not be treated as a secured creditor entitled to vote on the

Brazilian Reorganization Plan (as defined below).

On November 23, 2012, the Rede Debtors voluntarily filed petitions for judicial

reorganization under Brazilian bankruptcy law.[13]  None of the Rede Concessionaires filed a

petition.  (Fact Stip. at ¶ 33.)

---

[10]     Rothschild sent invitations to at least ten potential buyers (both foreign and domestic) and granted seven credentialed groups access to a dataroom.  (Fact Stip. at ¶ 29.)

[11]     On November 20, 2012, ANEEL revoked the license granted to Rede's electricity trading subsidiary, CTCE, to market and trade electricity.  (Fact Stip. at ¶ 32.)

[12]     As discussed above, Denerge is a holding company that is the direct parent and controlling shareholder of EEVP and is the indirect parent of Rede.  (Fact Stip. at ¶ 2.)

[13]     Under Brazilian law, a debtor retains the right to administer its assets and affairs and may continue to run its business once a judicial reorganization has commenced.  A judicial administrator is appointed by the court and is responsible for, among other things, overseeing the debtor's management of its day-to-day affairs and managing the claims verification process.  (Law Stip. at ¶ 8.)  On December 19, 2012, the Brazilian Court appointed Deloitte Touche Tohmatsu Consultores Ltda. (the "<u>Judicial Administrator</u>") as the independent judicial administrator for the Rede Debtors' judicial reorganization case.  (Fact Stip. at ¶ 48.)

IV.    **The Brazilian Bankruptcy Proceeding**

A.    **Competing Plans Are Submitted**

On December 19, 2012, the Second Court of Bankruptcies and Judicial Restructuring

Court of the Central Civil Court of the City of São Paulo, State of São Paulo (the "Brazilian

Bankruptcy Court") granted the Rede Debtors' request to commence reorganization proceedings.

(Fact Stip. at ¶ 34.)  On March 15, 2013, the Rede Debtors presented a reorganization plan to the

Brazilian Bankruptcy Court based on an investment and share purchase agreement (the

"Equatorial-CPFL SPA") executed between the Rede Debtors and Equatorial-CPFL (the

"Equatorial-CPFL Plan"), which provided for Mr. Jorge Queiroz de Moraes Junior (the

"Controlling Shareholder") of the Rede Group to transfer his stock in the Rede Group to

Equatorial-CPFL.  (Fact Stip. at ¶¶ 34-35.)  The Equatorial-CPFL SPA also prohibited the Rede

Debtors from marketing the company to other potential bidders until June 30, 2013, at which

time the agreement could be terminated by either party.[14]  (Fact Stip. at ¶ 34.)  The Equatorial-

CPFL Plan provided that certain creditors of the Rede Debtors, including the Noteholders, would

receive their choice of either: (i) cash equal to fifteen percent of the principal amount of their

claim in return for assignment of such claim to Equatorial-CPFL or (ii) reinstatement of 65

percent of the principal amount of their claim paid out over 27 years, without interest.  (Fact Stip.

at ¶ 35.)

On April 4, 2013, the Indenture Trustee and the Ad Hoc Group filed petitions with the

Brazilian Bankruptcy Court objecting to a number of issues related to the Equatorial-CPFL Plan,

including (i) the proposed substantive consolidation of the Rede Debtors for plan purposes and

(ii) the voting rights of FI-FGTS under the Equatorial-CPFL Plan, based on the Ad Hoc Group's

---

[14]    COPEL and Energisa had access to the dataroom from approximately December 2011 until February 2012,
and again for several days prior to the October 11, 2012 bid deadline.  (Fact Stip. at ¶ 36.)

belief that FI-FGTS qualified as an insider (as more fully discussed *infra*).  (Fact Stip. at ¶ 56.)

Interested parties COPEL and Energisa S.A. also filed a petition with the Brazilian Bankruptcy

Court challenging the exclusivity that had been granted to Equatorial-CPFL under the

Equatorial-CPFL SPA and requesting access to the dataroom for purposes of forming a

competing bid.  (Fact Stip. at ¶ 36.)

On May 14, 2013, the Judicial Administrator published a preliminary official list of

claims, listing FI-FGTS as holding a secured claim against Denerge.[15]  (Fact Stip. at ¶ 67.)  On

May 27, 2013, FI-FGTS informed the Brazilian Bankruptcy Court that the put option that it held

pursuant to its 2010 investment agreement had been exercised one day prior to the bankruptcy

filing, and it offered the shares to the Brazilian Bankruptcy Court to dispose of them.[16]  (Fact

Stip. at ¶ 66.)

On May 27, 2013, the Brazilian Bankruptcy Court ruled on eleven issues, including those

raised by the Ad Hoc Group on April 4, 2013, finding, among other things, that FI-FGTS was a

secured creditor.[17]  (Fact Stip. at ¶¶ 58, 71.)  The Indenture Trustee then sought an expedited

appeal of such order and an injunction of the solicitation of the Equatorial-CPFL Plan with the

São Paulo State Court of Appeals (the "Brazilian Court of Appeals").  The Brazilian Court of

---

[15]    Under Brazilian bankruptcy law, creditors have ten days to object to a claim's allowance after publication
of the preliminary official list.  (Fact Stip. at ¶ 68.)  In general, however, creditors may separately object to a
claimant's right to vote on a plan of reorganization outside of this timeframe.  (Fact Stip. at ¶ 68.)  The parties
dispute whether the ten-day objection deadline should have applied to any objection to FI-FGTS's claim and its right
to vote as a secured creditor.  (Fact Stip. at ¶ 68.)

[16]    FI-FGTS's shares of EEVP were never returned to EEVP in connection with the exercise of FI-FGTS's put
right.  (Fact Stip. at ¶ 66.)

[17]    The Brazilian Bankruptcy Court reasoned that,
> There can be no doubt that this fund [FI-FGTS] is a creditor of the companies
> under reorganization; however, in the past, it had been a shareholder, but since it
> validly exercised a sale option prior to joining the legal reorganization
> proceedings, it no longer has the status of shareholder.  Proof of notification of
> exercise of the option has been provided, which is an undisputed fact in the case
> files . . . Its vote was completely valid in its status as secured creditor.

(Fact Stip. at ¶ 71 (citing Exhibit P (Decision of the Brazilian Bankruptcy Court, dated May 27, 2013) at 4 (changes
in original)).)

Appeals denied the request for an injunction and the appeal remains pending.  (Fact Stip. at ¶ 60.)

On May 29, 2013, COPEL and Energisa (together, "COPEL-Energisa") publicly announced a competing bid to purchase certain assets of the Rede Debtors (the "COPEL-Energisa Proposal").  (Fact Stip. at ¶ 37.)  The COPEL-Engerisa Proposal provided, among other things, for the purchase of the Rede Concessionaires' stock held by Rede for approximately R$3.2 billion.  (Fact Stip. at ¶ 37.)  The COPEL-Energisa Proposal was not a plan of reorganization; it neither (i) provided for allowance or distribution to particular claims nor (ii) opined on the consolidation of the Rede Debtors.  (Fact Stip. at ¶ 37.)  Although the Ad Hoc Group supported the COPEL-Energisa Proposal, the Rede Debtors rejected it on June 5, 2013, the date of the first Rede creditors' meeting (discussed *infra*), reasoning, among other things, that (i) the proposal was not binding, as it required certain condition precedents to be met; (ii) it did not satisfy the restructuring requirements imposed by ANEEL; (iii) the estimated creditor recoveries it promised were inflated; and (iv) it would strip the Rede Debtors of their business activity and/or assets.  (Fact Stip. at ¶ 38.)

On June 5, 2013, the first Rede creditors' meeting was held and an official committee of creditors was formed.[18]  (Fact Stip. at ¶ 49.)  The meeting was discontinued prior to creditors voting on the Equatorial-CPFL Plan.  (Fact Stip. at ¶ 40.)  On June 12, 2013, COPEL-Energisa withdrew the COPEL-Engerisa Proposal due to lack of information necessary to confirm the proposal and tight deadlines for its confirmation.  (Fact Stip. at ¶ 41.)

---

[18]    The official committee of creditors had the duty to obtain and inform all creditors of information regarding the Rede Debtors.  (Fact Stip. at ¶ 49.)  The members of the creditors' committee were (i) FI-FGTS, acting through its attorney-in-fact, Cassio Viana de Jesus, representing itself as the sole voting secured creditor, and (ii) Moneda Deuda LatinoAmericana Fondo de Inversion ("Moneda"), acting through its counsel Eduardo Augusto Mattar, representing the class of unsecured creditors.  (Fact Stip. at ¶ 49.)  Moneda is a Chilean investment fund and the largest member, by holdings, of the Ad Hoc Group.  (Fact Stip. at ¶ 49.)

On July 2, 2013, one day prior to the second creditors' meeting, Energisa submitted a revised proposal and plan of reorganization that largely mirrored the structure of the Equatorial-CPFL SPA and the Equatorial-CPFL Plan (the "Revised Energisa Proposal"). (Fact Stip. at ¶¶ 41-43.) On July 3, 2013, the second creditors' meeting was held, but this meeting was also discontinued prior to voting on any plan of reorganization. (Fact Stip. at ¶ 44.)

### B. Creditors Vote on the Brazilian Reorganization Plan

Prior to the third creditors' meeting, the Brazilian Bankruptcy Court suggested that it would not allow a vote on both the Revised Energisa Proposal and the Equatorial-CPFL Plan. (Fact Stip. at ¶ 45.) As a result, at the third creditors' meeting held on July 5, 2013, representatives of Energisa and Equatorial-CPFL presented their respective plans to creditors of the Rede Debtors, after which the Rede Debtors adjourned the meeting and requested that the creditors tell them informally which plan they preferred. (Fact Stip. at ¶ 45.) The Ad Hoc Group and the Indenture Trustee did not participate in the poll due to, among other things, their view that both plans contained inappropriate consolidation of the debtor entities. The majority of the remaining creditors who did participate indicated a preference for the Revised Energisa Proposal. (Fact Stip. at ¶ 45.) Accordingly, Equatorial-CPFL withdrew its bid, and, upon resuming the third creditors' meeting, the Rede Debtors proposed a plan embodying the Revised Energisa Proposal (the "Brazilian Reorganization Plan" or "Plan") and the final votes of the Rede Debtors' creditors on the Plan were solicited.

Secured creditor FI-FGTS voted in favor of the Brazilian Reorganization Plan.[19] (Fact Stip. at ¶ 69.) Each of the members of the Ad Hoc Group voted to reject the Brazilian

---

[19]     The other secured creditor, Banco Nacional de Desenvolvimento Econômico e Social ("BNDES"), was not permitted to vote on the Brazilian Reorganization Plan because its subsidiary, BNDES Participações S.A. ("BNDESPar"), is a minority shareholder in the Rede Debtors. (Fact Stip. at ¶ 63.) Brazilian bankruptcy law prevents shareholders, affiliates, controlling and controlled companies of the debtor or entities which have a partner

Reorganization Plan.  (Fact Stip. at ¶ 98.)  Having obtained a ruling from the Brazilian

Bankruptcy Court that the Indenture Trustee would be permitted to vote, the Indenture Trustee,

on behalf of all Noteholders other than the members of the Ad Hoc Group (including those

Noteholders who did not direct or authorize the Indenture Trustee to vote on their behalf), also

voted to reject the Brazilian Reorganization Plan.  (Fact Stip. at ¶ 99.)  On July 15, 2013, Rede

appealed to the Brazilian Court of Appeals and sought injunctive relief and reconsideration of the

Brazilian Bankruptcy Court's decision allowing the Indenture Trustee to vote, but the Brazilian

Court of Appeals denied this request.  (Fact Stip. at ¶ 100.)

At the time of the third creditors' meeting, several objections to the treatment of claims or

the right of certain creditors to vote remained pending before the Brazilian Bankruptcy Court,

including the Ad Hoc Group's objection to FI-FGTS's status as a secured creditor.  (Fact Stip. at

¶ 51.)  While all creditors on the official list of creditors (the "Creditors' List") were permitted to

attend the general meetings of creditors and to vote on the Brazilian Reorganization Plan, in

many cases in which a dispute remained outstanding with respect to a creditor's right to vote, the

Brazilian Bankruptcy Court ordered that the applicable creditor be permitted to cast a provisional

vote.  The Brazilian Bankruptcy Court then instructed the Judicial Administrator to make two

calculations of voting results: one considering all such provisional votes and one disregarding

such provisional votes.  (Fact Stip. at ¶ 51.)

On July 26, 2013, after the final votes were solicited, the Ad Hoc Group objected to

confirmation of the Brazilian Reorganization Plan, again raising an objection to consolidation of

the Rede Debtors; Rede and Energisa filed replies.  (Fact Stip. at ¶ 61.)

---

or shareholder with an equity interest above ten percent in the debtor's capital stock, or in the capital stock of which
the debtor or any of his partners have an equity interest exceeding ten percent, from voting on account of claims
against the debtor.  (Law Stip. at ¶ 16.)  BNDES held a claim that was allowed against Rede in the amount of
R$134.5 million and was secured by, among other things, Rede's equity interests in one of the Rede
Concessionaires, CNEE.  (Fact Stip. at ¶ 63.)

On September 9, 2013, the Brazilian Bankruptcy Court entered its decision confirming the Brazilian Reorganization Plan. (Fact Stip. at ¶ 61.) As part of this decision, the Brazilian Bankruptcy Court reversed its prior decision and held that that the Indenture Trustee could not vote on behalf of those Noteholders from whom it did not receive direction or authorization, finding that under the terms of the Indenture, the Indenture Trustee did not have the power, without the consent of each of the individual beneficial holders of Perpetual Notes, to effect any alteration to the values, charges, conditions, or maturity dates of the Perpetual Notes. (Fact Stip. at ¶ 100.) The Brazilian Bankruptcy Court determined that the Brazilian Reorganization Plan should nevertheless be confirmed because, even without the vote of the Indenture Trustee, both the secured and unsecured creditor classes had voted to accept the Brazilian Reorganization Plan. (Fact Stip. at ¶ 101.)

### C.   The Brazilian Reorganization Plan is Approved Via Cram-Down

On September 24, 2013, the Ad Hoc Group filed an objection to the Brazilian Bankruptcy Court's September 9, 2013 order confirming the Brazilian Reorganization Plan, arguing that (i) the vote of Denerge and EEVP-level creditors should not be permitted to control the outcome of the Rede-level assets and (ii) FI-FGTS's vote should not be counted because FI-FGTS remained a shareholder of EEVP (and thus, an insider ineligible to vote) due to the fact that, at the time the Rede Debtors filed for reorganization, FI-FGTS's exercise of its put right had not been perfected by a share transfer in the appropriate corporate books. (Fact Stip. at ¶ 70.) The Brazilian Bankruptcy Court overruled the Ad Hoc Group's objections, and the Ad Hoc Group appealed. (Fact Stip. at ¶¶ 70-73.)

On November 14, 2013, after determining that it had miscalculated the voting results, the Brazilian Bankruptcy Court entered an order clarifying its September 9, 2013 order (together, the

"Confirmation Decision").  The November 14, 2013 order clarified that, even after disregarding

the vote of the Indenture Trustee, the unsecured creditor class had narrowly missed the

numerosity requirement for confirming the Brazilian Reorganization Plan;[20] therefore, the

Brazilian Bankruptcy Court had confirmed the Brazilian Reorganization Plan pursuant to the

cram-down provisions of Brazilian bankruptcy law.[21]  (Fact Stip. at ¶¶ 101-02.)

The Rede Debtors have appealed the Confirmation Decision, arguing that the Brazilian

Reorganization Plan was approved by both the secured and unsecured creditor classes by

consensual means and without the need for cram-down.  (Fact Stip. at ¶ 104.)  Specifically, the

Rede Debtors have appealed the Confirmation Decision's denial of Rede's argument that the

votes of parties arguably related to Equatorial and CPFL – which together held seven votes –

should be designated because such parties were related to the losing bidders, competitors of the

Rede Debtors who had publicly declared that they were interested in investing in the Rede

Debtors if the Brazilian Reorganization Plan was rejected.  (Fact Stip. at ¶ 104.)  The Ad Hoc

---

[20]    Approval of a plan under Brazilian law may be obtained in one of two ways: (1) through a "regular creditor majorities" procedure or (2) through a "cram-down" procedure.  Approval of a plan through the regular creditor majorities procedure requires that the plan be approved by each class of claims.  In Classes II and III, the plan must be approved by (i) more than 50 percent of the creditors present at the creditors' meeting, in number, in each class and (ii) creditors that hold more than 50 percent in amount of the allowed claims present at the creditors' meeting, in each class.  All such 50 percent thresholds are calculated only over the base of creditors who, cumulatively, (a) are present at the meeting; (b) are allowed to vote; and (c) actually do so (i.e., do not voluntarily abstain from voting). (Law Stip. at ¶ 17.)  Here, at least four more accepting votes from unsecured creditors in Class III in the Brazilian Reorganization Plan were required for such class to accept the Plan.  (Fact Stip. at ¶ 104.)

[21]    If the required majorities are not met for acceptance of the plan under Brazilian law, the plan may still be approved via a cram-down of the rejecting class.  Approval of a plan through the cram-down procedure requires the court to approve the plan if the following cumulative requisites are met: (1) holders of a simple majority (more than 50 percent) in amount of the total allowed claims who (a) are present at the creditors' meeting, (b) are allowed to vote, and (c) actually do so, vote for approval of the plan; (2) the required majorities are met in one class of claims (if there are only two classes of claims); and (3) (a) if the required majorities are not met in Class II or in Class III, more than one-third (1/3) of the creditors that (i) are present at the creditors' meeting, (ii) are allowed to vote, and (iii) actually do so, in number, in such class, must have voted in favor of the plan and, cumulatively, creditors that hold more than one-third (1/3) in amount of the allowed claims and that (a) are present at the creditors' meeting, (b) are allowed to vote, and (c) actually do so, in such class, must have voted in favor of the plan. In addition, Brazilian bankruptcy law expressly provides that confirmation via cram-down is only possible if the plan does not entail different treatment among the creditors of the class that rejected it.  The parties disagree regarding whether Brazilian law permits cram-down where the plan provides different treatment to creditors in the dissenting class under some circumstances if done for a fair and valid justification (e.g., to enforce subordination rights or legislative priority). This issue has been extensively briefed by the parties and is currently on appeal in Brazil.  (Law Stip. at ¶ 18.)

Group also has appealed, arguing (i) that the Indenture Trustee had the right to vote on behalf of all Noteholders and (ii) that FI-FGTS did not have a right to vote as a secured creditor.  (Fact Stip. at ¶ 102.)  Both parties' appeals remain pending with the Brazilian Court of Appeals.  (Fact Stip. at ¶¶ 61, 104.)

If the Rede Debtors are successful on appeal and the Brazilian Court of Appeals otherwise affirms the Confirmation Decision, the Brazilian Reorganization Plan may be deemed approved by both the secured and unsecured creditor classes by consensual means (without the need for cram-down under Brazilian bankruptcy law).  If the Ad Hoc Group prevails in its appeal with respect to the right of the Indenture Trustee to vote, the unsecured class would reject the Brazilian Reorganization Plan by amount, notwithstanding the results with respect to numerosity. Moreover, if the Ad Hoc Group also prevails in its appeal with respect to FI-FGTS's right to vote, the Brazilian Reorganization Plan will be unable to satisfy the requirement of a consenting class for cram-down purposes.  Finally, if the Ad Hoc Group prevails in its appeal with respect to consolidation, the Brazilian Reorganization Plan will be unable to satisfy any requirement for either ordinary confirmation or confirmation by cram-down under Brazilian bankruptcy law. (Fact Stip. at ¶ 104.)

### V.   The Terms and Provisions of the Brazilian Reorganization Plan

Under the Brazilian Reorganization Plan, Energisa will invest R$1.2 billion in the Rede Concessionaires and R$1.95 billion to pay the creditors of the Rede Debtors.  The investment in the Rede Concessionaires may be derived from a variety of sources, including the sale of one or more Rede Concessionaires by Energisa, although Energisa has announced that no such sale is contemplated in the foreseeable future.

The Brazilian Reorganization Plan generally provides that certain creditors of the Rede Debtors, including the Noteholders, will have the option to receive either (i) cash equal to 25 percent of the principal amount of their claims in return for an assignment of such claims to Energisa or (ii) reinstatement of 100 percent of the principal amount of their claims paid out over 22 years, without interest.  (Fact Stip. at ¶ 43.)  The Brazilian Reorganization Plan also requires the Controlling Shareholder of the Rede Debtors to transfer his equity interests in the Rede Group to Energisa in consideration for the symbolic price of R$1.00, and it requires the assumption by Energisa of certain guarantees of the debts of the Rede Group that had been provided by the Controlling Shareholder of the Rede Debtors.  (Fact Stip. at ¶ 43.)

### A.     Substantive Consolidation of the Rede Debtors

The Brazilian Reorganization Plan is premised on the consolidation of the assets and liabilities of all five Rede Debtors for voting and distribution purposes.  (Fact Stip. at ¶ 55.)  The Brazilian Reorganization Plan does not result in the actual corporate consolidation or merger of the Rede Debtors.  (Fact Stip. at 23 n.13.)  However, the Plan permits Energisa to modify the corporate structure of the Rede Group after the consummation of the transaction.  (Fact Stip. at 23 n.13 (citing Ex. L (Brazilian Reorganization Plan) § 3.5).)  In addition, Article 9.7.2 of the Brazilian Reorganization Plan specifies means for payment of all intercompany claims other than claims held by the Rede Concessionaires.  (Fact Stip. at 23 n.13.)  As described above, the Ad Hoc Group and the Indenture Trustee filed petitions with the Brazilian Bankruptcy Court objecting to, among other things, the presentation of a consolidated plan.  (Fact Stip. at ¶¶ 58-61.)  On May 27, 2013, the Brazilian Bankruptcy Court issued a decision finding that the consolidation of the Rede Debtors was appropriate and permitting the joint processing and

16

consolidation of the Rede Debtors for plan purposes.  The Brazilian Bankruptcy Court found that

the consolidation of the Rede Debtors was appropriate because,

> The "Rede" group, subject to reorganization, is in fact organized as
> a corporate group, with a common controlling company and credit
> inter-dependence, as loans exist between the companies that
> comprise the group, and cross corporate guarantees to honor
> obligations to third parties.  Moreover, the plan is based on the
> joint cash flow of all the companies, in such a way to find an
> effective means of reorganization.[22]

On July 26, 2013, the Ad Hoc Group renewed its objection to consolidation in its objection to the

confirmation of the Brazilian Reorganization Plan.  (Fact Stip. at ¶ 61.)  The substantive

consolidation of the Rede Debtors is one of the infirmities of the Brazilian Reorganization Plan

that is cited by the Ad Hoc Group as a reason to deny the relief requested by the Foreign

Representative in this Court.[23]

### B.    Classification of Claims Generally

There were 111 claims asserted against the five Rede Debtors, totaling approximately

R$3.990 billion and USD$655 million.  Of those claims, 33 were asserted against multiple Rede

Debtors.  (Fact Stip. at ¶ 53.)  Under Brazilian bankruptcy law, claims are divided into three

classes: (i) labor related claims ("Class I"); (ii) secured claims ("Class II"); and (iii) unsecured

claims, claims entitled to general and special privilege, and subordinated claims ("Class III").

(Law Stip. at ¶ 16.)  No Class I claims were asserted against the Rede Debtors.  Class II

(secured) claims were filed by two creditors: (i) FI-FGTS, which asserted a R$712.5 million

Class II secured claim against Denerge, secured by equity interests in other Rede Debtors, and

(ii) BNDES, which asserted a R$135.5 million Class II secured claim against Rede.  (Fact Stip.

---

[22]      Fact Stip. at ¶ 58 (citing Ex. P (Decision of the Brazilian Bankruptcy Court, dated May 27, 2013) at 1-3).
[23]      The May 27, 2013 decision by the Brazilian Court did not address factors that, according to the Ad Hoc
Group, would ordinarily be considered by a United States court considering the issue of substantive consolidation.
Such factors include: disregard of corporate separateness, creditor confusion about which entity with which they
were doing business, intermingling of funds, or fraud.  (Fact Stip. at ¶ 59.)

at ¶ 53.) Most of the Class III unsecured and other claims, totaling approximately R$1.89 million plus USD$655 million, were asserted against Rede. (Fact Stip. at ¶ 53.) Approximately R$775 million in claims were owed by certain Rede Debtors to other Rede Debtors, and, if netted, would result in R$500 million owing to Rede from other Rede Debtors. (Fact Stip. at ¶ 53.)

The Brazilian Reorganization Plan does not provide for treatment of the shareholders of the Rede Debtors as, under Brazilian bankruptcy law, shareholders cannot be deprived of their interests without their consent.[24] (Fact Stip. at ¶ 93.)

### C.   Treatment of Secured Claims

Under the Brazilian Reorganization Plan, secured claim holders were permitted to choose from three options for the treatment of their claims.[25] (Fact Stip. at ¶¶ 74-75.) BNDES chose to assign its debt to Energisa in return for a 25 percent cash distribution paid on the closing date.[26] (Fact Stip. at ¶ 74.) FI-FGTS chose a 22-year note bearing four percent interest in exchange for committing to provide future financing to the Rede Debtors. (Fact Stip. at ¶ 76.) FI-FGTS is to

---

[24]     Although the Brazilian Reorganization Plan does not extinguish the remaining equity interests held by minority shareholders, as discussed below, such remaining minority shares will be diluted upon consummation of the Brazilian Reorganization Plan. (Fact Stip. at ¶¶ 94-95.)

[25]     The three options consisted of:
> (A) retention of security interest and restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a two percent interest rate, with a balloon principal payment in year 22;
> (B) if the secured creditor chooses to commit to future financing of the reorganized companies on terms set forth in section 1.2.22 of the Plan, retention of security interest and restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a four percent interest rate, with a balloon payment in year 22; and
> (C) the secured creditor may assign its debt to Energisa in return for a 25 percent cash distribution paid on the closing date.

Fact Stip. at ¶ 74 (citing Ex. L (Brazilian Reorganization Plan) at Articles 6 and 8).

[26]     BNDESPar, a subsidiary of BNDES and the holder of 15.9 percent of the shares of Rede, held a right to sell its Rede shares to EEVP in return for a debt claim of R$390 million, which right was never exercised. (Fact Stip. at ¶ 91.) As a result, BNDESPar did not have a claim listed on the Creditors' List and will not receive a new distribution as a claimant under the Brazilian Reorganization Plan. (Fact Stip. at ¶ 91.) However, BNDESPar's claim for the exercise of the put remains a contingent liability for which Energisa may ultimately be responsible. (Fact Stip. at ¶ 92.)

provide future financing to the Rede Debtors in an amount equal to 90 percent of its claim, for a minimum period of payment of twenty years, with (i) at least a twelve-year period without the payment of principal; (ii) monthly amortization after the twelve-year period; and (iii) a maximum interest rate of seven percent per year, payable as agreed between the parties, as adjusted annually.[27]  (Fact Stip. at ¶ 76.)

### D.    Treatment of Unsecured Claims

Although all unsecured claims are contained in one class under the Brazilian Reorganization Plan, the Plan distinguishes among three types of unsecured claims:

1. Concessionaire Creditor Claims:  unsecured guaranty, surety, or joint claims against the Rede Debtors where the creditor's underlying principal claim is against one or more of the non-debtor Rede Concessionaires;
2. Subsidiary Concessionaire Claims:  claims of non-debtor Rede Concessionaires; and
3. General Unsecured Claims:  all unsecured claims (other than Concessionaire Creditor Claims and Subsidiary Concessionaire Claims), including claims by Noteholders.

(Fact Stip. at ¶ 77.)  As more fully described below, under the Brazilian Reorganization Plan, Concessionaire Creditor Claims and Subsidiary Concessionaire Claims will be satisfied in full, whereas General Unsecured Claims, including claims of Noteholders, are entitled to a 25 percent recovery.  The Ad Hoc Group maintains that such "disparate" treatment is a basis for denying the Plan Enforcement Relief (as defined below).

### 1.    Treatment of Concessionaire Creditor Claims

There are eleven allowed Concessionaire Creditor Claims on the Creditors' List, totaling approximately R$421 million.  (Fact Stip. at ¶ 83.)  The holders of these claims, the "Concessionaire Creditors,"[28] were permitted to vote on the Brazilian Reorganization Plan

---

[27]    Fact Stip. at ¶ 76 (citing Ex. L (Brazilian Reorganization Plan) at § 1.2.22).

[28]    A U.S.-based entity, the Inter-American Development Bank ("IADB") holds the majority in amount of the Concessionaire Creditor Claims, holding approximately USD$151 million against the Rede Concessionaires, CEMAT and CELTINS, which claims are guaranteed by Rede.  (Fact Stip. at ¶ 84.)  The remaining Concessionaire Creditors are Brazilian-based entities.  (Fact Stip. at ¶ 84.)

because they hold guarantee or surety claims against one or more of the Rede Debtors (and therefore, the Rede Debtors are jointly and severally liable for the payment of such claims). (Fact Stip. at ¶ 83.)

While the Concessionaire Creditors were permitted to choose from the three Plan treatment options available to holders of General Unsecured Claims (discussed *infra*), if a Concessionaire Creditor agreed not to take further enforcement actions and waived all defaults, fines, and penalties against the Rede Concessionaires and the Rede Debtors, such Concessionaire Creditor (i) will receive (within 60 days of the closing date) payment in full of any portion of its obligations that have already matured pursuant to their original schedule and (ii) will have its surety, guarantee, or joint obligations replaced by Energisa on the same terms and conditions thereof.  (Fact Stip. at ¶ 85.)

### 2.    Treatment of Subsidiary Concessionaire Claims

Each of the eight Rede Concessionaires holds a Subsidiary Concessionaire Claim against the Rede Debtors, which, in the aggregate, total approximately R$504 million.  (Fact Stip. at ¶ 87.)  None of these parties was permitted to vote on the Brazilian Reorganization Plan, as the Rede Concessionaires are affiliates of the Rede Debtors.  (Fact Stip. at ¶ 87.)

The Brazilian Reorganization Plan provides that holders of Subsidiary Concessionaire Claims will have their claims satisfied in full pursuant to the ANEEL Plan.[29]  (Fact Stip. at ¶¶ 88-89.)  As discussed above, Energisa has committed to invest at least R$1.2 million in the Rede Concessionaires under the ANEEL Plan; a significant portion of such amount will be used to cause the Rede Debtors to settle the Subsidiary Concessionaire Claims.  (Fact Stip. at ¶ 90.)

---

[29]    To satisfy ANEEL's requirements, the Rede Debtors originally submitted their Correctional Plan to ANEEL on October 26, 2012, and such plan was subsequently revised.  Among other things, this plan laid out Energisa's proposal for the assumption and reorganization of the Rede Concessionaires (as amended on October 1, 2013 and presented by the Rede Debtors and Energisa, the "ANEEL Plan").

### 3.    Treatment of General Unsecured Claims

There are 109 General Unsecured Claims against the Rede Debtors,[30] including those of

the Noteholders, totaling approximately R$3.142 billion plus approximately USD$655 million.

(Fact Stip. at ¶ 78.)  The Brazilian Reorganization Plan offers three plan treatment options to

holders of General Unsecured Claims,[31] and it provides that the type of consideration chosen by

the majority of Noteholders (in principal amount) who indicated a preference for a type of

consideration would govern the form of consideration provided to all Noteholders.[32]  (Fact Stip.

at ¶ 82.)  After the Brazilian Reorganization Plan was approved, in response to the Rede Debtors'

solicitation of Noteholders' preference, a majority in principal amount of the Noteholders

(including all members of the Ad Hoc Group) chose Option C – to assign their claims to

Energisa in return for a 25 percent cash distribution to be paid on the closing date.  (Fact Stip. at

¶ 82.)

---

[30]     Except for certain holders of the Perpetual Notes and the IADB, all known holders of the General Unsecured Claims are Brazilian-based entities.  (Fact Stip. at ¶ 78.)  Because the Perpetual Notes are held in global note form with DTC, neither the Rede Debtors nor the Ad Hoc Group knows with certainty the identities or nationalities of the beneficial holders of the Perpetual Notes (other than the members of the Ad Hoc Group).  The Ad Hoc Group purports to have been in contact with other holders of Perpetual Notes, one or more of which are also based in the U.S.  The Perpetual Note claims were issued only to (i) non-U.S. persons in accordance with Regulation S of the U.S. Securities Act of 1933, as amended (the "Securities Act") and (ii) qualified institutional buyers in accordance with Rule 144A of the Securities Act.  (Fact Stip. at ¶ 79.)

[31]     The three plan treatment options available to a holder of an allowed General Unsecured Claim are:
          (A) restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a one percent interest rate, with a balloon principal payment in year 22;
          (B) if the unsecured creditor chooses to commit to future financing of the reorganized companies on terms defined in section 1.2.23 of the Plan, restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a one percent interest rate, subject to annual monetary adjustment on the value of the principal balance, with a balloon payment in year 22; and
          (C) the unsecured creditor may assign its claim(s) to Energisa in return for a 25 percent cash distribution paid on the closing date.
(Fact Stip. at ¶ 81 (citing Ex. L (Brazilian Reorganization Plan) at Articles 7 and 8).)

[32]     Fact Stip. at ¶ 81 (citing Ex. L (Brazilian Reorganization Plan) at § 7.1.4).

**VI.    The Foreign Representative Commences a Chapter 15 Proceeding
in the United States**

On January 16, 2014, the Foreign Representative filed the Petition, requesting recognition

of the Brazilian Bankruptcy Proceeding as a foreign main proceeding.[33]  The Petition also

requested additional relief, pursuant to sections 1521 and 1507 of the Bankruptcy Code,

enforcing the Brazilian Reorganization Plan in the United States, including an order (i) granting

full faith and credit to (a) the Brazilian Reorganization Plan and (b) the Confirmation Decision

and enjoining acts in the U.S. in contravention of the Confirmation Decision; and (ii) authorizing

and directing the Indenture Trustee and DTC to take actions to carry out the terms of the

Brazilian Reorganization Plan, including assigning the Global Note to Energisa and making the

associated payments to the beneficial Noteholders (collectively, the "Plan Enforcement

Relief").[34]  According to the Foreign Representative, the latter is necessary because the Indenture

Trustee has indicated that it will not assign the Global Note to Energisa (in accordance with the

Confirmation Decision) without obtaining a directive from this Court.  (Fact Stip. at ¶ 117.)  In

addition, the Foreign Representative has stated that, while Energisa may deposit funds with the

Brazilian Bankruptcy Court for the benefit of the holders of the Perpetual Notes, Energisa is

unlikely to fund the distribution directly to the Indenture Trustee without assurance of such

assignment.  (Fact Stip. at ¶ 117.)

The Ad Hoc Group did not object to entry of an order recognizing (i) the Brazilian

Bankruptcy Proceeding as a foreign main proceeding pursuant to chapter 15 of the Bankruptcy

Code and (ii) José Carlos Santos, the Petitioner, as Rede's Foreign Representative.  Accordingly,

the parties agreed to, and the Court approved, a stipulated order granting recognition to the

---

[33]    Petition at ¶ 35.
[34]    Petition at ¶¶ 53-68.

Brazilian Bankruptcy Proceeding as a foreign main proceeding.[35]  Then, on February 25, 2014,

the Ad Hoc Group filed an objection to the requested Plan Enforcement Relief (the

"Objection"),[36] arguing that (i) the Foreign Representative is not entitled to relief under sections

1521 or 1507 of the Bankruptcy Code and (ii) granting the Plan Enforcement Relief would be

manifestly contrary to U.S. public policy and should be denied pursuant to section 1506.[37]  In

particular, the Ad Hoc Group argues that the Brazilian Reorganization Plan has been "fraught

with infirmities," including (i) a significant extraction of value for shareholders; (ii) disparate

treatment of similarly situated creditors; (iii) targeting of such disparate treatment at U.S.-based

creditors; (iv) protection of local creditor interests by fiat; and (v) the use of "phantom"

consolidation and a single insider vote to cram down an otherwise unconfirmable plan.[38]

On May 2, 2014, the Foreign Representative filed a reply to the Objection (the

"Reply"),[39] arguing that the Brazilian Bankruptcy Proceeding was not administered in a manner

manifestly contrary to U.S. principles and that the requested relief is proper under sections 1521

and 1507 of the Code.[40]  Although both the Foreign Representative and the Ad Hoc Group were

entitled to an evidentiary hearing on the propriety of the Plan Enforcement Relief, the parties

instead agreed to file the Stipulation of Facts and the Stipulation of Law rather than conduct an

evidentiary hearing.  On May 9, 2014, the Court heard argument on whether the Plan

Enforcement Relief requested by the Foreign Representative should be granted.

---

[35]      Order Granting Recognition of Foreign Main Proceeding [Docket No. 18].
[36]      Objection of Ad Hoc Group of Rede Noteholders to Foreign Representative's Petition for Recognition of
Brazilian Bankruptcy Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a),
1509(b), 1515, 1517, 1520 and 1521 [Docket No. 16].
[37]      Objection at 14-21.
[38]      Objection at 2.
[39]      Foreign Representative's Reply to Objection of Ad Hoc Group of Rede Noteholders to Foreign
Representative's Motion for Order Granting Plan Enforcement [Docket No. 29].
[40]      Reply at ¶¶ 24-42; *see also* Petition at ¶¶ 57-88.

## DISCUSSION

### I.    Applicable Law

Chapter 15 of the Bankruptcy Code, which adopted the substance and most of the text of the United Nations Commission on International Trade Law's ("UNCITRAL") Model Law on Cross-Border Insolvency, provides a framework for recognizing and giving effect to foreign insolvency proceedings. *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 132 (2d Cir. 2013). A central tenet of chapter 15 is the importance of comity in cross-border insolvency proceedings. *In re Cozumel Caribe S.A. de C.V.*, 482 B.R. 96, 114-15 (Bankr. S.D.N.Y. 2012). If a foreign case is recognized as a foreign main proceeding, as it was here, certain relief automatically goes into effect, pursuant to 11 U.S.C. § 1520, and, under section 1521, a bankruptcy court may grant "any appropriate relief" in order to "effectuate the purpose of this chapter [15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Such relief expressly includes:

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);
> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;
> (5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;
> (6) extending relief granted under section 1519(a); and
> (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

24

11 U.S.C. § 1521(a).

There are nonetheless certain restrictions.  The court may grant relief under section 1521(a) "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected,"[41] and it may subject any relief granted under section 1521 to "conditions it considers appropriate."  11 U.S.C. § 1522(b).  One court has observed that the policy underlying section 1522 is that there should be "a balance between relief that may be granted to the foreign representative and the interests of the person that may be affected by such relief."  *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) (citing GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY); *see also* H. R. Rep. No. 109-31, at 116 (2005).

In addition to the types of relief enumerated in section 1521, section 1507(a) of the Bankruptcy Code provides that "[s]ubject to the specific limitations stated elsewhere in this chapter[,] the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States."  11 U.S.C. § 1507(a); *see also* H.R. Rep. No. 109-31 (2005).  Pursuant to section 1507, the court is authorized to grant any "additional assistance" available under the Bankruptcy Code or under "other laws of the United States," provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b).[42]  *In re Toft*, 453 B.R. 186, 190 (Bankr.

---

[41]    11 U.S.C. § 1522(a).

[42]    Section 1507(b) of the Bankruptcy Code provides that,

In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure –

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

S.D.N.Y. 2011).  As noted in *Toft*, however, the relationship between sections 1507 and 1521 "is

not entirely clear."  *Id.*  The Fifth Circuit in *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1054 (5th

Cir. 2012), considered, as a matter of first impression, whether a foreign representative may

independently seek relief under either section 1521 or section 1507 and whether a court may

itself determine under which provision such relief would fall.  The *Vitro* court concluded that a

court confronted by this situation should first consider the specific relief enumerated under

section 1521(a) and (b), and, if the relief is not provided for there, the court should then consider

whether the requested relief falls more generally under section 1521's grant of any appropriate

relief.  *Id.* at 1054.  "Appropriate relief," the Fifth Circuit concluded, is "relief previously

available under Chapter 15's predecessor, § 304."  *Id.*  "Only if a court determines that the

requested relief was not formerly available under § 304," the Fifth Circuit continued, "should a

court consider whether relief would be appropriate as 'additional assistance' under § 1507."  *Id.*

It remains to be seen whether the three-part analysis crafted by the *Vitro* court is embraced by

other courts.

Chapter 15 thus provides courts with broad, flexible rules to fashion relief that is

appropriate to effectuate the objectives of the chapter in accordance with comity.  *See In re Bear

Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333-34

(S.D.N.Y. 2008); *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("chapter 15

maintains – and in some respects enhances – the 'maximum flexibility' . . . that section 304

provided bankruptcy courts in handling ancillary cases in light of principles of international

---

(3) prevention of preferential or fraudulent dispositions of property of
the debtor;
(4) distribution of proceeds of the debtor's property substantially in
accordance with the order prescribed by this title; and
(5) if appropriate, the provision of an opportunity for a fresh start for
the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

comity and respect for the laws and judgments of other nations") (citations omitted), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007). While the interplay between the relief available under sections 1507 and 1521 is far from clear, it is evident that recognition assistance of the types available under those sections is "largely discretionary and turns on subjective factors that embody principles of comity." *Toft*, 453 B.R. at 190 (citing *Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 389 B.R. at 333, *aff'g* 374 B.R. 122 (Bankr. S.D.N.Y. 2007)).

Of particular significance to the case at bar is the well-established principle that the relief granted in a foreign proceeding and the relief available in the United States do not need to be identical. *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010). On the other hand, it is also clear that "[t]he principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States." *Bank of New York v. Treco (In re Treco)*, 240 F.3d 148, 157 (2d Cir. 2001); *see also Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 171-73 (2d Cir. 2008); *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987); *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985); *Toft*, 453 B.R. at 190-191.

Moreover, all relief under chapter 15, including relief requested under either section 1521 or section 1507, is subject to the limits in section 1506, which permits a court to decline to take any action, including granting additional relief pursuant to section 1521 or additional assistance

27

pursuant to section 1507 of the Bankruptcy Code, if such action would be "manifestly contrary" to the public policy of this country.[43]  *Toft*, 453 B.R. at 193 (citing 11 U.S.C. § 1506).

However, the public policy exception is clearly drafted in narrow terms and "the few reported cases that have analyzed [section] 1506 at length recognize that it is to be applied sparingly."  *Toft*, 453 B.R. at 193; *see In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (the public policy exception embodied in section 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States") (citing H. R. Rep. No. 109-31(I), at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172) (grammatical changes omitted); *see also Fairfield Sentry*, 714 F.3d at 139-40; *Bd. of Dirs. of Telecom Arg. S.A.*, No. 05-17811, 2006 WL 686867, at *25 (Bankr. S.D.N.Y. Feb. 24, 2006) ("the foreign law . . . must not be repugnant to the American laws and policies") (citing *In re Brierley*, 145 B.R. 151, 166 (Bankr. S.D.N.Y. 1992)), *aff'd*, 528 F.3d 162 (2d Cir. 2008); *In re Culmer*, 25 B.R. 621, 631 (Bankr. S.D.N.Y. 1982)); *see also In re Sino-Forest Corp.*, 501 B.R. 655, 664-665 (Bankr. S.D.N.Y. 2013).  Foreign judgments "are generally granted comity as long as the proceedings in the foreign court 'are according to the course of a civilized jurisprudence, *i.e.* fair and impartial.'"  *Toft*, 453 B.R. at 194 (citing *In re Ephedra Prods. Liab. Litig.*, 349 B.R. at 336 (citing and quoting the seminal case on comity, *Hilton v. Guyot*, 159 U.S. 113, 205-06, 16 S. Ct. 139, 40 L. Ed 95 (1895))); *see also Metcalfe*, 421 B.R. at 697 (the key determination required under section 1506 is whether the procedures used in the foreign jurisdiction "meet our fundamental standards of fairness").

As described in detail above, the Foreign Representative has requested that the Court grant the additional Plan Enforcement Relief, which consists of the following:

---

[43]     Section 1506 of the Bankruptcy Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.

28

> (i) an order granting full faith and credit[44] to the [Confirmation Decision] and the Brazilian Reorganization Plan, and an injunction of acts in the U.S. in contravention of that order; and (ii) an order authorizing and directing the Indenture Trustee and DTC to take the necessary actions to carry out the terms of the Brazilian Reorganization Plan, including assigning the Global Note to Energisa and making the associated payments to the beneficial Noteholders.

(Reply at ¶ 11.)  For the reasons that follow, the Court finds that the requested Plan Enforcement Relief is proper under both sections 1521 and 1507 of the Bankruptcy Code and should not be denied pursuant to the public policy exception in section 1506, and it therefore grants the Plan Enforcement Relief.

## II.    The Plan Enforcement Relief is Proper Under Section 1521 of the Bankruptcy Code

The Plan Enforcement Relief requested by the Foreign Representative is "appropriate relief" of a type not specifically enumerated in the non-exhaustive list set forth in section 1521(a), which the Foreign Representative asserts is nonetheless proper because it is the type of relief that was "available under section 304 [of the Bankruptcy Code] and is routinely granted under U.S. law."  (Reply at ¶¶ 25-26 (citing *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1054 (5th Cir. 2012)).)  The Foreign Representative asserts that requests for an order (i) enforcing a foreign confirmation order, including the request for an injunction of acts in contravention of such order, and (ii) directing the Indenture Trustee and DTC to take steps to assign the Global Note and make payments to the Noteholders, are each types of requested relief that were available under section 304 of the Bankruptcy Code and are types of relief typically granted in chapter 11 plenary proceedings as well.  (Reply at ¶¶ 26-27.)  Accordingly, the Foreign Representative maintains, such relief is available under section 1521.

---

[44]    As a technical matter, the Confirmation Decision and the Brazilian Reorganization Plan are not entitled to "full faith and credit" inasmuch as these are words taken from Article IV of the Constitution of the United States and are inapplicable to foreign judgments.

The Court agrees. The request by the Foreign Representative that the Court (i) enforce the Brazilian Reorganization Plan and the Confirmation Decision and (ii) enjoin acts in the U.S. in contravention of the Confirmation Decision is relief of a type that courts have previously granted under section 304 of the Bankruptcy Code and other applicable U.S. law. *See, e.g., Bd. of Dirs. of Telecom Arg.*, 528 F.3d at 174-76; *see also In re Petition of Garcia Avila*, 296 B.R. 95, 114-15 (Bankr. S.D.N.Y. 2003); *see generally* 11 U.S.C. § 1141(d)(1)(A) (granting discharge to chapter 11 debtor upon confirmation except as otherwise provided for in the plan); 11 U.S.C. § 524(a) (describing the effect of a discharge). Similarly, the Foreign Representative's request for an instruction directing the Indenture Trustee and DTC to take the actions necessary to carry out the terms of the Brazilian Reorganization Plan, including assigning the Global Note to Energisa and making payments to beneficial Noteholders, is also relief of a type available under U.S. law. *See, e.g.,* 11 U.S.C. § 1142(b) (providing that a court "may direct . . . any . . . necessary party to execute or deliver or join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan"); *In re Washington Mut., Inc.*, No. 08-12229, 2012 WL 1563880 at *38 (Bankr. D. Del. Feb. 24, 2012) (directing indenture trustee to make distributions in order to effectuate plan transactions).

The Ad Hoc Group does not challenge the Foreign Representative's position that the Plan Enforcement Relief is available under section 1521 of the Bankruptcy Code. Rather, the Ad Hoc Group asserts that the Court should consider the particular facts of the case at hand and balance the equities of the requested relief against those facts. The Ad Hoc Group believes that the Foreign Representative cannot meet his burden with respect to the applicable balancing tests and

factors[45] and urges that the Court exercise its discretion and deny the requested Plan

Enforcement Relief.  (Objection at 14-17.)

    As discussed above, relief under section 1521 may be granted "only if the interests of

creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C.

§ 1522(a); *Int'l Banking Corp.*, 439 B.R. at 626.  Section 1522 requires the bankruptcy court to

ensure the protection of both the creditor(s) and the debtor(s).  The Court finds that the interests

of the Rede Debtors and their creditors, including the members of the Ad Hoc Group, will be

sufficiently protected by the granting of the Plan Enforcement Relief.  Enforcement of the

Confirmation Decision – and ordering an injunction against actions the Ad Hoc Group may

pursue in the United States in contravention of such decision – will allow the Rede Debtors to

reorganize and to make distributions to creditors (including to the 63 percent of Noteholders who

are not members of the Ad Hoc Group and who are not contesting any aspect of the Brazilian

Reorganization Plan), consistent with the Brazilian Reorganization Plan.  The Brazilian

Reorganization Plan contemplates, as a condition precedent to its full implementation, this

Court's approval of the Plan Enforcement Relief.  In fact, the Foreign Representative has

represented that the Indenture Trustee will likely decline to make the assignment of the Global

Note without the directive of this Court.  The Court's refusal to grant the Plan Enforcement

Relief would thus mean that the Brazilian Reorganization Plan, which has already been

---

[45]    The Ad Hoc Group contends that a "very similar set of factors are to be considered when granting relief under either section 1521 or 1507."  (Objection at 16.)  As noted in *Sino-Forest,* "[t]he factors listed in section 1507(b)(1)-(5), to be considered in deciding whether to extend comity under section 1507, are not included in section 1521(a). . . .[S]ection 1522 places limitations on the relief under section 1521: relief may be granted 'only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.'"  *Sino-Forest Corp.*, 501 B.R. at 664 n.4; *see also In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (noting that the relief under section 1521(b), entrusting the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, may be granted only if the interests of local creditors are "sufficiently protected," but making no mention that the other balancing factors listed in section 1507(b) apply to the relief available under section 1521(a)).  *See infra* for a discussion of whether the Plan Enforcement Relief may be granted as "additional assistance" under section 1507.

substantially consummated, could not be fully implemented and the distributions to Noteholders

would be prevented or substantially delayed.  Denying the relief would also mean that the Ad

Hoc Group would likely return to Brazil to attempt to renegotiate and seek a higher distribution,

or would commence lawsuits against the Debtor in the United States to recover further on its

claims.  In short, the Ad Hoc Group simply wants another chance to renegotiate the terms of the

Brazilian Reorganization Plan and offers no evidence that its efforts would be successful.

Moreover, the Plan Enforcement Relief does not prevent the Ad Hoc Group from continuing to

assert its rights under Brazilian law in the pending appeals of the decisions of the Brazilian

Bankruptcy Court.  In balancing the interests of the Rede Debtors against those of the Ad Hoc

Group, the Court concludes that the Plan Enforcement Relief passes muster under section

1522(a) and is relief that is proper under section 1521.

### III.    The Plan Enforcement Relief is Also Proper Under Section 1507 of the Bankruptcy Code

As discussed above, if recognition is granted, the bankruptcy court may grant "additional

assistance" to a foreign representative under chapter 15 or under other laws of the United States,

pursuant to section 1507 of the Code.  Section 1507(b) directs the Court to "consider whether

such assistance, consistent with principles of comity, will reasonably assure" the following:

> (1) just treatment of all holders of claims against or
> interests in the debtor's property;
> (2) protection of claim holders in the United States against
> prejudice and inconvenience in the processing of claims in
> such foreign proceeding;
> (3) prevention of preferential or fraudulent dispositions of
> property of the debtor;
> (4) distribution of proceeds of the debtor's property
> substantially in accordance with the order prescribed by
> this title; and
> (5) if appropriate, the provision of an opportunity for a
> fresh start for the individual that such foreign proceeding
> concerns.

11 U.S.C. § 1507(b)(1)-(5).  These provisions embody the protections that were previously contained in section 304 of the Bankruptcy Code, "with one critical exception: the principle of comity was removed as one of the factors and elevated to the introductory paragraph." *Atlas Shipping*, 404 B.R. at 740.

Although the Court need not reach the issue,[46] the Court has also considered whether the Plan Enforcement Relief would be available as "additional assistance" under section 1507 and concludes that it is.  The Court has determined that granting the Plan Enforcement Relief meets the requirements of section 1507(b) inasmuch as it reasonably assures (a) the just treatment of creditors; (b) protection of U.S. creditors against prejudice or inconvenience in the processing of their claims; (c) prevention of preferential or fraudulent transfers; and (d) distribution of proceeds substantially in accordance with the Code's priority scheme.  Thus, the Plan Enforcement Relief also may be granted as "additional assistance" pursuant to section 1507.

## A.  Creditors Were Treated Justly in Brazil

Section 1507(b)(1) requires that additional relief only be granted if the just treatment of creditors is ensured.  11 U.S.C. § 1507(b)(1).  The "just treatment" factor is generally satisfied upon a showing that the applicable law "provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors." *Bd. of Dirs. of Telecom Arg.*, 528 F.3d at 170 (citations omitted and grammatical changes in original) (discussing the "just treatment" factor under 11 U.S.C. § 304(c)).  The court in *Board of Directors of Telecom Argentina* explained that instances in which a court has held that a foreign proceeding does not satisfy this factor include where the proceeding "fails to provide creditors 'access to information and an opportunity to be heard in a meaningful manner,' which are

---

[46]     *See Atlas Shipping*, 404 B.R. at 741 (granting relief under section 1521 and concluding that it was unnecessary to determine whether "additional assistance" was available under section 1507).

'[f]undamental requisites of due process,'" or where the proceeding "would not recognize a creditor as a claimholder." *Id.* (citations omitted).

Here, the Foreign Representative has demonstrated that creditors were given access to information and a meaningful opportunity to be heard in the Brazilian Bankruptcy Proceeding and that Brazilian law provides for a "comprehensive procedure" for the orderly and equitable distribution of the Rede Debtors' assets to creditors. Specifically, the Brazilian Bankruptcy Proceeding provided creditors with ample opportunity to obtain information about the Rede Debtors and the terms of the various plan proposals. It also provided creditors with the right and ability to vote on a plan of reorganization, to submit proofs of claim, and to file objections to and appeals of the decisions of the Brazilian Bankruptcy Court. It is clear that the Brazilian Reorganization Plan provides for equitable distribution of the Rede Debtors' assets based on the claims that creditors submitted, once the Brazilian Reorganization Plan becomes fully implemented.[47] As such, the Court finds that the Plan Enforcement Relief meets the requirements of section 1507(b)(1) to reasonably assure the just treatment of creditors.

## B.  There is No Prejudice to U.S. Creditors in the Processing of Claims in Brazil

The second factor of section 1507(b) requires that U.S. creditors be protected against "prejudice and inconvenience in the processing of claims" in the foreign proceeding. 11 U.S.C. § 1507(b)(2). Straining to find a basis to fit its arguments within this factor, the Ad Hoc Group argues that U.S. creditors were prejudiced in the processing of Noteholders' votes because the

---

[47]    In arguing that creditors were not treated justly in Brazil, the Ad Hoc Group also points to the fact that the Brazilian Reorganization Plan provides different treatment to certain types of unsecured claims. For the reasons discussed at section IV.C., *infra*, the Court finds that the disparate treatment of the claims of the Rede Concessionaires and the Concessionaire Creditors under the plan was necessary in order to comply with ANEEL's requirement that the Rede Concessionaires be adequately capitalized before ANEEL would lift its intervention. As the Foreign Representative points out, had ANEEL refused to lift its intervention and instead terminated the Rede Concessionaires' concession agreements with the Brazilian government, the Rede Group would be left with only "an unprecedented and lengthy litigation claim against the Brazilian government," the recoveries of which have already been partially assigned to secure certain debts of the Rede Concessionaires. (Reply at ¶¶ 32-33.)

Indenture Trustee had the "rug pulled out from [under] it during the voting process" and voting

on an individual basis by Noteholders required the satisfaction of various procedural hurdles.

(Objection at 17.)  The Foreign Representative points out, however, that all Noteholders who

wished to appear at the creditors' meetings and vote independently of the Indenture Trustee were

permitted to do so after submitting documentation verifying their identity and holdings.  (Reply

at ¶ 36.)  Moreover, in evaluating the propriety of the Indenture Trustee's vote, the Brazilian

Bankruptcy Court recognized the right of individual Noteholders to vote.  Indeed, the entire issue

is a red herring inasmuch as the Ad Hoc Group admits that the vote of the Indenture Trustee was

rendered irrelevant because the unsecured class voted against the Brazilian Reorganization Plan,

notwithstanding the elimination of the Indenture Trustee's vote.[48]  (Objection at 18.)  To the

extent that the Ad Hoc Group invites the Court to draw an inference that the Brazilian

Bankruptcy Court acted in a prejudicial, result-oriented fashion by reversing its own

determination on the Indenture Trustee's right to vote, the Court declines the invitation.  Nothing

in the record supports such an inference.  As such, the Court finds that the second factor of

section 1507(b) is satisfied.

### C.  There Were No Preferential or Fraudulent Property Distributions in the Brazilian Bankruptcy Proceeding

The third factor of section 1507(b) requires that the additional assistance reasonably

assure the "prevention of preferential or fraudulent dispositions of property of the debtor."  11

U.S.C. § 1507(b)(3).  The Ad Hoc Group argues summarily that the Brazilian Reorganization

Plan would promote, rather than prevent, fraudulent dispositions of property by permitting FI-

FGTS and BNDESPar to recover significant value on their claims, notwithstanding that such

recovery will flow from equity and/or structurally subordinated positions.  (Objection at 18.)  It

---

[48]    Moreover, indenture trustees are not entitled to vote on chapter 11 plans in the United States.

is not at all apparent that this was the intent of this subsection of section 1507.  In any event, the record is devoid of evidence indicating fraudulent dispositions of property to either FI-FGTS or BNDESPar.  As the record clearly demonstrates, the Brazilian Bankruptcy Court determined that FI-FGTS is a secured creditor, even though it exercised its put right to obtain a secured claim against Denerge one day prior to the date that the Rede Debtors filed for bankruptcy.  (Fact Stip. at ¶¶ 64-65.)  Therefore, the distribution it receives on account of its secured claim cannot be considered fraudulent.  BNDESPar, on the other hand, is a minority shareholder, owning 15.9 percent of the shares of the Rede Debtors.  (Fact Stip. at ¶¶ 63, 91.)  BNDESPar held a right to sell its Rede shares to EEVP in return for a debt claim of R$390 million, but it never exercised such right.  As a result, BNDESPar will not receive any new distribution under the Brazilian Reorganization Plan, though it will retain its Rede shares.  (Fact Stip. at ¶ 91.)  While equity cannot be extinguished under Brazilian bankruptcy law, the record indicates that BNDESPar's Rede shares will be substantially diluted as a result of Energisa's substantial capital investment in the Rede Group as required by the ANEEL Plan.  Any distribution to BNDESPar cannot be considered a fraudulent or preferential disposition of property.  The Court finds, therefore, that the third factor under section 1507(b) has been satisfied.

### D. The Distribution of Proceeds Under the Brazilian Reorganization Plan Was Substantially in Accordance With U.S. Law

The fourth factor of section 1507(b) requires that the additional assistance provided to a foreign representative will reasonably assure the "distribution of proceeds of the debtor's property substantially in accordance with the [Bankruptcy Code]."  11 U.S.C. § 1507(b)(4).  The Ad Hoc Group argues that the distribution of the Rede Debtors' property violates the Bankruptcy

Code because the Brazilian Reorganization Plan runs afoul of the absolute priority rule[49] by preserving value for equity and/or structurally subordinated creditors FI-FGTS and BNDESPar, and that the Confirmation Decision wrongly approved such treatment through "cram-down," exactly when the absolute priority rule should protect creditors.  (Objection at 19.)

As discussed in sections IV.B. and IV.C. below, the cram-down provisions of Brazilian bankruptcy law provide meaningful protections that are similar to the protections embodied in U.S. law and the Plan's different treatment of certain unsecured creditors has a reasonable basis and was necessary to consummate the Plan.  As such, proceeds under the Brazilian Reorganization Plan are being distributed substantially in accordance with U.S. law pursuant to section 1507(b)(4).[50]

IV.    **With Respect to Section 1506, the Brazilian Bankruptcy Proceeding Was Administered in a Manner Consistent With U.S. Public Policy**

The centerpiece of the Ad Hoc Group's objection is that the Plan Enforcement Relief would be fundamentally inconsistent with U.S. public policy, and accordingly, runs afoul of section 1506 of the Bankruptcy Code.  The Ad Hoc Group specifically cites to five aspects of the Brazilian Reorganization Proceeding that it asserts violate U.S. public policy: (i) an unfair marketing process; (ii) the use of "phantom" consolidation and a single insider vote to cram down an otherwise unconfirmable plan; (iii) a significant extraction of value for shareholders which is violative of the distribution scheme under U.S. law; (iv) disparate treatment of similarly situated creditors; and (v) targeting of that disparate treatment at U.S.-based creditors, including to protect local creditor interests.  (Objection at 2.)

---

[49]    A foreign insolvency regime need not contain an absolute priority rule identical to that of U.S. law.  *Garcia Avila*, 296 B.R. at 111; *see also Bd. of Dirs. of Telecom Arg.*, 528 F.3d at 173.

[50]    Moreover, both the Rede Debtors and the Ad Hoc Group have appealed the confirmation of the Brazilian Reorganization Plan, which was approved via cram-down.  If, after all appeals are taken by the parties in Brazil, the cram-down requirements are not found to have been satisfied, the Brazilian Reorganization Plan will be rejected and a liquidation proceeding will be commenced.

As discussed above, the public policy exception embodied in section 1506 of the

Bankruptcy Code is to be narrowly construed and applied "sparingly." *Toft*, 453 B.R. at 193

("the few reported cases that have analyzed [section] 1506 at length recognize that it is to be

applied sparingly").  The Court finds that neither the Brazilian Reorganization Plan nor the

Brazilian bankruptcy law concepts which are the bases of the Confirmation Decision are

manifestly contrary to U.S. public policy.  Brazilian bankruptcy law meets our fundamental

standards of fairness and accords with the course of civilized jurisprudence.  Accordingly, the

public policy exception reflected in section 1506 does not provide a basis for denial of the Plan

Enforcement Relief.

**A.  The Marketing Process of the Rede Debtors' Assets, the Consolidation of the Rede
     Debtors, and the Confirmation of the Brazilian Reorganization Plan Did Not Violate
     Creditors' Due Process Rights and Were Not Manifestly Contrary to U.S. Public
     Policy**

While the members of the Ad Hoc Group complain about virtually every aspect of the

Brazilian Bankruptcy Proceeding from start to finish, their chief complaints center around the

process by which the Brazilian Reorganization Plan was approved; *i.e.*, the manner in which the

Rede Debtors' assets were marketed; the determination by the Brazilian Bankruptcy Court that

the Rede Debtors' assets and liabilities could be consolidated for plan purposes; and the voting

process, which they argue was procedurally unfair and violated creditors' due process rights.

The Court considers these arguments in turn.

**1.  The Marketing Process of the Rede Debtors' Assets**

The Ad Hoc Group asserts that the marketing process of the Rede Debtors' assets was

flawed and favored local stakeholders and insiders.  In particular, the Ad Hoc Group argues that

the Rede Debtors initially chose the Equatorial-CPFL Plan without competitive bidding and then

inappropriately granted the bidder exclusivity, such that Energisa was only able to submit a

competing proposal after a contest at the second creditors' meeting.  (Objection at 9.)  The Ad

Hoc Group also contends that it was improper for the Rede Debtors to refuse to accept the first

Energisa proposal, alleging that it would have resulted in a materially better recovery for

Noteholders and for all structurally senior creditors.  (Objection at 9.)[51]

The record reflects otherwise.  The Rede Debtors' assets were widely marketed through a

competitive bidding process.  Rothschild obtained a number of binding offers, including the joint

bid by CPFL and Equatorial which was initially selected by the Rede Debtors and was presented

to the Brazilian Bankruptcy Court in the form of the Equatorial-CPFL Plan.  (Fact Stip. at ¶¶ 28-

30; 34-35.)  Though the Ad Hoc Group contends that the Equatorial-CPFL SPA improperly

prohibited the Rede Debtors from marketing the company to other potential bidders for some

time, such a prohibition is recognized in large chapter 11 cases.  *See, e.g., In re Global Crossing,*

*Ltd.*, 295 B.R. 726, 741 n.55 (Bankr. S.D.N.Y. 2003) (approving debtor's compliance with a no-

shop provision in a purchase agreement that included a carve-out for communications required

for the debtors to comply with their fiduciary duties).  Furthermore, the record illustrates that

COPEL-Energisa was eventually able to make not one, but two competing bids, the first of

which the Rede Debtors evaluated but ultimately rejected for various valid reasons, including

that it was inferior to the Equatorial-CPFL proposal.  (Fact Stip. at ¶¶ 37-42.)

The Ad Hoc Group offers no evidence to substantiate its arguments that the Rede Debtors

should not have rejected the original Energisa proposal and that it would have resulted in a better

recovery for Noteholders.  The bald assertion that a party should have or could have received a

higher distribution, especially without supporting evidence as to how much more creditors

should have or could have received, is insufficient to make a showing that the requested ancillary

---

[51]    Specifically, the Ad Hoc Group asserts that the original proposal submitted by Energisa (that offered to purchase operating subsidiaries directly from Rede) would have caused the purchase price to flow solely to Rede's creditors, thus maximizing creditor value.  (Objection at 9.)

relief should be denied or that creditors' due process rights were violated.  *See generally Bd. of Dirs. of Telecom Arg.*, 528 F.3d at 173 (creditor's argument that court should not grant comity because creditors may receive a smaller distribution in the foreign jurisdiction than they would receive in the United States was irrelevant if the other factors under former section 304(c) of the Bankruptcy Code were met, as the Bankruptcy Code "does not require that the amount of a distribution in a foreign insolvency proceeding be equal to the hypothetical amount the creditor would have received in a proceeding under U.S. law").

Moreover, when Energisa submitted its revised proposal, the Rede Debtors presented it to creditors along with the Equatorial-CPFL Plan.  Rede's creditors preferred the revised Energisa proposal to the Equatorial-CPFL Plan because it raised unsecured creditor recoveries from fifteen percent (under the Equatorial-CPFL Plan) to 25 percent (under the Energisa proposal which became the Brazilian Reorganization Plan).  (Fact Stip. at ¶ 43.)  The marketing process of the Rede Debtors' assets and the resulting evolution and improvement of the return to unsecured creditors resemble chapter 11 processes and section 363 sales that take place routinely in U.S. bankruptcies.  *See*, *e.g.*, *In re Boston Generating, LLC*, 440 B.R. 302, 310-313 (Bankr. S.D.N.Y. 2010) (discussing the extensive marketing and sale process of a 363 sale of a debtor, in which the debtor set a bid deadline that permitted competing bidders to submit competing bids in the form of chapter 11 plans of reorganization).  Accordingly, the Court finds that the marketing process was not manifestly contrary to U.S. public policy.

### 2.  The Determination by the Brazilian Bankruptcy Court That the Rede Debtors' Assets and Liabilities Could be Consolidated for Plan Purposes

The Ad Hoc Group next argues that the Brazilian Bankruptcy Court erred, as a matter of Brazilian law, when it allowed the substantive consolidation of the Rede Debtors for plan purposes and that a United States court would not, under *Union Savings Bank v. Augie/Restivo*

*Baking Company, Ltd. (In re Augie/Restivo Baking Company, Ltd)*, 860 F.2d 515 (2d Cir. 1988),

grant substantive consolidation under similar circumstances.  In addition to arguing that

substantive consolidation was inappropriate as a matter of law, the Ad Hoc Group contends that

substantive consolidation inappropriately enabled the confirmation of an otherwise

unconfirmable plan as a result of FI-FGTS's vote.  (Objection at 11.)

       As a threshold matter, substantive consolidation for plan purposes, in and of itself, is not

manifestly contrary to U.S. public policy, and while not routinely granted, substantive

consolidation of certain debtors in appropriate circumstances has been approved by courts in

chapter 11 cases.  *See, e.g.*, *Augie/Restivo*, 860 F.2d at 518-21; *FDIC v. Colonial Realty Co.*, 966

F.2d 57 (2d Cir. 1992) (affirming district court's decision that the bankruptcy court properly

directed substantive consolidation of the bankruptcy estates over the objection of creditors); *In re*

*Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992) (approving

plan with substantive consolidation of debtors and stating that "[t]he equitable doctrine of

substantive consolidation permits a Court in a bankruptcy case involving one or more related

corporate entities, in appropriate circumstances, to disregard the separate identity of corporate

entities, and to consolidate and pool their assets and liabilities and treat them as though held and

incurred by one entity"); *In re Value City Holdings, Inc.*, No. 08-14197, 2010 WL 4916389, at

*7 (Bankr. S.D.N.Y. May 17, 2010) (confirming a plan that involved substantive consolidation

of the debtors).

       Here, the Brazilian Bankruptcy Court made specific findings that substantive

consolidation of the Rede Debtors was appropriate for plan purposes.  The Brazilian Bankruptcy

Court found that the Rede debtors were "organized as a corporate group, with a common

controlling company and credit inter-dependence" as a result of loans that exist between the

41

companies in the group and cross-corporate guarantees to third parties. (Fact Stip. at ¶ 58.) Though the Ad Hoc Group argues that the Brazilian Bankruptcy Court did not address factors which may "ordinarily" be considered by a United States court confronted with the issue of substantive consolidation, it is not appropriate for this Court to superimpose requirements of U.S. law on a case in Brazil or to second-guess the findings of the foreign court. *See Cozumel Caribe*, 508 B.R. at 337 ("To inquire into a specific foreign proceeding is not only inefficient and a waste of judicial resources, but more importantly, necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where the creditors are always provided the proverbial 'second bite at the apple.'") (citation omitted)). Moreover, the record is clear that the Ad Hoc Group exercised its due process rights to object to the Brazilian Bankruptcy Court's decision to allow substantive consolidation of the Rede Debtors and, later, its right to appeal such decision. For the foregoing reasons, the Court finds that substantive consolidation of the Rede Debtors for plan purposes was not manifestly contrary to U.S. public policy.

### 3. The Voting Process and Approval of the Plan Through Cram-Down

The next set of arguments raised by the Ad Hoc Group is that the creditors' due process rights were violated because the Brazilian Bankruptcy Court excluded the Indenture Trustee's vote on the Brazilian Reorganization Plan and that the Plan was approved through cram-down in a procedurally unfair manner. We address these arguments in turn.

The Ad Hoc Group argues that it was improper for the Brazilian Bankruptcy Court to exclude the Indenture Trustee's vote on the Brazilian Reorganization Plan, focusing on the fact that the Brazilian Bankruptcy Court first ruled that the Indenture Trustee would be permitted to vote on the Brazilian Reorganization Plan, and then "reconsidered" and reversed that ruling after

the Indenture Trustee had voted against the Plan.  (Objection at 10, 20.)  Such action, combined with the "arbitrary" consolidation of the Rede Debtors, the Ad Hoc Group argues, operated to deprive Noteholders of a "meaningful opportunity to be heard (or at least to vote) in the Brazilian Bankruptcy Proceeding."  (Objection at 20.)

Despite the inferences that the Ad Hoc Group wishes the Court to draw, there is no evidence that the Brazilian Bankruptcy Court disregarded the Indenture Trustee's vote *because* it voted against the Brazilian Reorganization Plan.  Rather, there is ample evidence that the Brazilian Bankruptcy Court determined that, based on the terms of the Indenture, the Indenture Trustee did not have the power, without the consent of each of the individual beneficial holders of the Perpetual Notes, to vote on the Plan.  (Fact Stip. at ¶¶ 99-102.)  Notably, the Ad Hoc Group does not contend that this decision was wrong as a matter of U.S. law; it is well-accepted that indenture trustees do *not* vote on chapter 11 plans.  In any event, the Ad Hoc Group admits that, although the Indenture Trustee was not permitted to vote on the Plan, its vote "proved largely irrelevant," as the unsecured class lacked the requisite votes to accept the Plan, and the Brazilian Bankruptcy Court eventually approved the Plan through cram-down procedures. (Objection at 10.)

The Ad Hoc Group next argues that the Brazilian cram-down procedures were not properly followed by the Brazilian Bankruptcy Court.  Specifically, the Ad Hoc Group contends that, because the affirmative vote of the secured creditor class required for cram-down purposes was cast by FI-FGTS, which was not a secured creditor, but rather, an affiliated entity (*i.e.*, a shareholder), the requirements for cram-down were not satisfied, and the Plan was approved in a procedurally unfair manner.  (Objection at 18.)

Assuming *arguendo* that this Court can review the decision of a Brazilian court on an issue of Brazilian law, and it cannot, the record is clear with respect to (i) the determination that FI-FGTS is a secured creditor and (ii) the Brazilian Bankruptcy Court's compliance with cram-down pursuant to Brazilian law.  FI-FGTS held a put option to sell its shares in exchange for a secured claim against Denerge, one of the Rede Debtors, pursuant to an investment agreement signed in 2010, over two years prior to the Brazilian Bankruptcy Proceeding.  (Fact Stip. at ¶ 65.) Although FI-FGTS's shares were not returned to EEVP in connection with the exercise of FI-FGTS's put right prior to the filing, FI-FGTS filed a petition with the Brazilian Bankruptcy Court showing that the put option had been exercised prior to the bankruptcy filing and offering those shares to the Brazilian Bankruptcy Court to dispose of them.  (Fact Stip. at ¶ 66.)  The Judicial Administrator then made a determination that FI-FGTS had a secured claim against Denerge in the amount R$712.5 million.  After the Ad Hoc Group objected to this determination, the Brazilian Bankruptcy Court ordered that the votes be counted both with and without FI-FGTS's affirmative vote, pending resolution of the dispute.  (Fact Stip. at ¶ 67.)  In its Confirmation Decision, the Brazilian Bankruptcy Court subsequently concluded that FI-FGTS had validly exercised its put option prior to the filing of the Brazilian Bankruptcy Proceeding and was therefore a secured creditor.  (Fact Stip. at ¶ 71.)  FI-FGTS voted to accept the Plan; its claim was the only voting claim in Class II, the secured creditor class,[52] and the Plan was confirmed via cram-down based on the acceptance of such class.[53]

---

[52]    Fact Stip. at ¶ 69.  The Ad Hoc Group also asserts that the term "secured creditor class" is a "misnomer" because such class only consisted of one single voting creditor, FI-FGTS.  (Objection at 11.)  The Court notes that, even under U.S. bankruptcy law, it is not uncommon for certain classes of creditors, particularly a class of secured claims, to contain only one claim.  The fact that the secured creditor class under the Brazilian Reorganization Plan contained only one secured claim does not establish unfairness or manipulation of the vote, as the Ad Hoc Secured Group alleges.

[53]    As explained in footnote 21, *supra*, approval of a plan through the cram-down procedure under Brazilian law requires the court to approve the plan if holders of a simple majority (more than 50 percent) in amount of the total allowed claims vote for approval of the plan (here, 74 percent of all creditors voted to approve the Plan); (2) the

The Court finds that the Brazilian Bankruptcy Court properly followed cram-down procedures and did not violate creditors' due process rights.   There is no showing that the Brazilian Bankruptcy Court ignored the Ad Hoc Group's concerns; rather it counted the results of the vote both with and without FI-FGTS's vote.   The court later determined that FI-FGTS had become a secured creditor prior to the time that the Rede Debtors filed for bankruptcy, and the vote of FI-FGTS enabled the Plan to be confirmed in accordance with cram-down procedures.

In any event, the Ad Hoc Group cannot plausibly assert that cram-down was a sham based on FI-FGTS' validly exercised put right, as the Ad Hoc Group voluntarily entered a capital structure that permitted FI-FGTS to obtain and exercise the put option which gave it the right to obtain a secured claim.   The Ad Hoc Group had the opportunity to contest the status of FI-FGTS as a secured creditor during the pendency of the Brazilian Bankruptcy Proceeding, and it also has exercised its right to appeal the Confirmation Decision, which appeal is still pending.   If the Ad Hoc Group prevails on appeal with respect to FI-FGTS's right to vote, the Brazilian Reorganization Plan will be unable to satisfy the requirement of a consenting class for cram-down purposes – but that is an issue for the Brazilian Bankruptcy Court, rather than this Court, to decide.   The record here is clear that, notwithstanding its disappointment with the outcome of the Brazilian Bankruptcy Proceeding, due process has been afforded to the Ad Hoc Group; the voting and cram-down process was not, as the Ad Hoc Group maintains, "fraught with procedural infirmities."   (Objection at 10.)

---

required majorities are met in one of the two classes of claims (here, the secured class); and (3) (a) if the required majorities are not met in Class II or in Class III, more than one-third (1/3) of the creditors that (i) are present at the creditors' meeting, (ii) are allowed to vote, and (iii) actually do so, in number, in such class, must have voted in favor of the plan and, cumulatively, creditors that hold more than one-third (1/3) in amount of the allowed claims and that (a) are present at the creditors' meeting, (b) are allowed to vote, and (c) actually do so, in such class, must have voted in favor of the plan.

**B.    The Distribution Scheme in the Brazilian Reorganization Plan is Not Manifestly Contrary to U.S. Public Policy**

The Ad Hoc Group asserts that the Brazilian Reorganization Plan results in distributions that are manifestly contrary to priority rules in the United States.  Under section 304, courts recognized that a foreign proceeding must produce results that are "substantially" in accordance with the priority rules of the Bankruptcy Code, but "the priority rules of the foreign jurisdiction need not be identical to those of the United States."  *Bd. of Dirs. of Telecom Arg.*, 528 F.3d at 170 n.9 (stating that the fourth factor of former section 304(c) of the Bankruptcy Code – assurance of just treatment of creditors – "looks to whether the priority rules of the foreign jurisdiction are 'substantially in accordance' with U.S. priority rules")); *see*, *e.g.*, *Garcia Avila*, 296 B.R. at 111-12 (Bankr. S.D.N.Y. 2003) (in granting a preliminary injunction, overruling an objection that a foreign plan violated the absolute priority rule, noting that the provisions of Mexican insolvency law "largely mirror" section 1129(b) of the Bankruptcy Code); *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597, 610 (Bankr. S.D.N.Y. 1988); *In re Schimmelpenninck*, 183 F.3d 347, 365 (5th Cir. 1999).  In any event, the Ad Hoc Group cites no authority that an insolvency scheme is manifestly contrary to U.S. public policy because it fails to mirror U.S. insolvency law.

Despite its lack of authority, the Ad Hoc Group argues that the Brazilian Reorganization Plan violates the absolute priority rule and is therefore manifestly contrary to U.S law because it "preserves value for equity and/or structurally subordinated creditors (FI-FGTS and BNDESPar)" and "goes so far as to potentially call for, or at least to enable, the repayment in full of one or both of such parties" at the expense of the structurally senior Noteholders.  (Objection at 19.)  Citing *Treco*, 240 F.3d at 159, the Ad Hoc Group argues that, in cases where foreign

bankruptcy law does not provide protections similar to those found in U.S. law, the U.S. bankruptcy court has denied the ancillary relief requested.

The Ad Hoc Group's citation to *Treco* in this context is unpersuasive.  In *Treco*, liquidators of a bank incorporated in the Bahamas and undergoing bankruptcy proceedings there filed a petition under section 304(a) of the Bankruptcy Code, seeking the turnover of certain funds held by Bank of New York and other entities located in the United States.  *Id*. at 151.  The bankruptcy court and the district court held that turnover was appropriate under section 304(c)(4), irrespective of whether Bank of New York's claim to the funds held by it was secured.  *Id*.  The Second Circuit disagreed, vacated the district court's judgment, and remanded the case, holding that, to the extent that the Bahamian proceeding subordinated Bank of New York's secured claim to administrative expenses, such treatment directly conflicted with the priority rules prescribed by U.S. law and thus violated section 304(c)(4).  *Id*. at 159.  *Treco* did not suggest that Bahamian law was manifestly contrary to U.S. public policy, which is the issue under section 1506.  It involved the rights of a secured creditor claiming a security interest in assets in the United States created under U.S. law.  Chapter 15 also has special protection for this class of creditors, requiring that their interests be sufficiently protected before the collateral can be entrusted to the foreign representative for distribution.  *See* 11 U.S.C. § 1521(b).

Brazilian bankruptcy law's cram-down requirements provide protections against junior stakeholders receiving or retaining value when dissenting senior stakeholders are not paid in full; such protections are similar (but not identical) to those in the United States.  Under Brazilian bankruptcy law, a plan may only be crammed down if, among other things, (i) the dissenting class approves by at least one-third in amount and at least one-third in number and (ii) all classes, in the aggregate, approve by a majority in amount.  (Law Stip. at ¶ 18.)  Here, 74 percent of all

claims, in amount, voted in favor of the Brazilian Reorganization Plan, and, in the class of

unsecured claims, 66.34 percent, in amount, and 47.7 percent, in number, voted to accept.[54]  This

is only 0.3 percent less in amount and 2.3 percent less in number than would be required under

the Bankruptcy Code for the class to have accepted, such that the absolute priority rule would not

apply.  *See* 11 U.S.C. § 1126(c).  The Foreign Representative argues that, with a difference this

small, it is difficult to see how the Brazilian Reorganization Plan could be considered manifestly

contrary to U.S. public policy.  The Court finds this argument persuasive.[55]

    With respect to the treatment of shareholders, although Brazilian law does not permit the

cancellation of equity without the consent of shareholders, Rede equity holders do not retain

meaningful value under the Plan at the expense of the Rede Debtors' unsecured creditors.  The

remaining minority shares will be vastly diluted upon consummation of the Brazilian

Reorganization Plan.  First, the Rede Debtors will make a capital call to repay Energisa

approximately R$498 billion for the amount Energisa paid to the creditors of the Rede Debtors in

exchange for the assignment of their approximately R$2 billion in claims, within one year of

such assignment and with 12.5 percent interest.  (Fact Stip. at ¶ 95.)  Under the Plan, Energisa

will also assume certain guarantees of the debts of the Rede Group that had been provided by the

Controlling Shareholder.  (Fact Stip. at ¶ 43.)  In addition, pursuant to the ANEEL Plan, Energisa

will invest a minimum of R$1.2 billion in the Rede Concessionaires, which Energisa anticipates

accomplishing by flowing such funds through the Rede Debtors via a series of capital calls.

(Fact Stip. at ¶ 95.)  This significant dilution of outstanding equity under the Brazilian

Reorganization Plan is consistent with the purpose of the absolute priority rule in the U.S., which

is designed to prevent shareholders from retaining equity in reorganized companies without

---

[54]    Fact Stip. at 22 n.12 (citing Ex. R (chart providing voting results as calculated by the Brazilian Bankruptcy
Court)).
[55]    *See also supra* note 49.

contributing new value.  *See Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121-22

(1939).  Moreover, approval of such treatment here also was obtained from the dissenting

unsecured class according to a Brazilian procedure designed to protect creditors' rights.

Therefore, although Brazilian bankruptcy law does indeed differ from U.S. law in certain

respects, the Foreign Representative has successfully demonstrated that the distribution scheme

in the Brazilian Reorganization Plan is not manifestly contrary to the public policy of the United

States.  This Court will not decline to extend comity and grant additional relief simply because

Brazilian bankruptcy law is not identical to U.S. bankruptcy law.  *See Ackermann v. Levine*, 788

F.2d 830, 842 (2d Cir. 1986) ("'We are not so provincial as to say that every solution of a

problem is wrong because we deal with it otherwise at home.'") (quoting *Loucks v. Standard Oil

Co. of N.Y.*, 224 N.Y. 99, 110-11 (1918) (Cardozo, J.)).

### C.  Differing Treatment of Similarly Situated Creditors by the Brazilian Reorganization Plan Was For a Valid Purpose and is Not Inconsistent With U.S. Law

The Ad Hoc Group argues that the Brazilian Reorganization Plan discriminates unfairly

among the Class III (Unsecured) creditors, pointing to the Plan's disparate treatment of the Class

III claims: Noteholders are receiving a 25 percent recovery while other Class III creditors, the

holders of Subsidiary Concessionaire Claims and Concessionaire Creditor Claims, are being paid

in full or essentially left unimpaired.  (Objection at 17.)[56]  However, the Ad Hoc Group ignores

the fact that this favorable treatment is necessary, and indeed required, under Brazilian law.

Pursuant to MP 577, the Brazilian government, in a valid exercise of its regulatory powers,

---

[56]   Specifically, the Ad Hoc Group criticizes the "special" treatment of two groups of Class III Claims: (i) intercompany claims owed to non-debtor subsidiaries that are electricity distribution concessionaires (the Rede Concessionaires), which claims are being paid in full under the Plan and (ii) obligations of electricity distribution concessionaires (the Subsidiary Concessionaires) that are also joint obligations of a Rede Debtor, which obligations are required to be brought current and then assumed by Energisa under the Brazilian Reorganization Plan (*i.e.*, paid in full).  *See* Objection at 6.

prohibits all concessionaires, including the Rede Concessionaires (*i.e.*, the Rede Debtors' non-debtor operating subsidiaries in which ANEEL intervened), from entering bankruptcy; therefore, the Rede Concessionaires' claims against the Rede Debtors must be paid in full[57] under the Correctional Plan approved by ANEEL before ANEEL will lift its intervention in the Rede Concessionaires.[58] (Reply at ¶ 10.) As the Foreign Representative makes clear, although certain Class III (Unsecured) members may be treated differently under the Brazilian Reorganization Plan, such disparate treatment is justified where, as here, a government regulator charged with protecting the resources in its country has required different treatment of a creditor involved in reorganization proceedings. Indeed, different treatment of groups of unsecured creditors is not uncommon under chapter 11.

The question before this Court is only whether such treatment of similarly situated claims is wholly at odds with U.S. public policy. The Court finds that it is not. *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns Corp.)*, 419 B.R. 221, 267 (Bankr. S.D.N.Y. 2009) (holding that plan did not unfairly discriminate against unsecured noteholder class receiving 32.7 percent recovery while awarding general unsecured creditors a 100 percent recovery because differing treatment was justified); *In re Adelphia Commc'ns*, 368 B.R. 140, 246-47 (Bankr. S.D.N.Y. 2007) (permitting differing treatment of unsecured creditors when done for a valid purpose, including to separate liquidated and

---

[57]    In addition to the claims of the Rede Concessionaires, under the Brazilian Reorganization Plan, the claims of the Concessionaire Creditors (*i.e.*, the creditors of the Rede Concessionaires that also hold guarantee or surety claims against one or more of the Rede Debtors) are entitled to the same treatment as all other general unsecured creditors, but, if the Concessionaire Creditors agree to waive further enforcement rights, defaults, and penalties against the Rede Concessionaires and the Rede Debtors, such creditors will have their surety or guarantee claims replaced by Energisa.

[58]    In order to lift its intervention in the Rede Concessionaires, ANEEL required that Energisa (or any potential investor in the Rede Debtors) address and mitigate the risks of potential defaults under the concession agreements with the Brazilian government by adequately capitalizing the Rede Concessionaires, including by settling the debts owed to the Rede Concessionaires by the Rede Debtors, curing the Rede Concessionaires' outstanding defaults, and assuming or paying down the Rede Concessionaires' outstanding debts. (Fact Stip. at ¶ 86.)

unliquidated claims); *see also In re LightSquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014).

Accordingly, the different treatment of the Class III (Unsecured) creditors under the Brazilian Reorganization Plan is not manifestly contrary to U.S. public policy, where the Rede Debtors have demonstrated that such treatment is reasonable due to ANEEL's intervention and where such treatment is necessary in order to confirm the Plan.

### D. To the Extent That There is Disparate Treatment, Such Treatment is Not Targeted at U.S.-Based Creditors and There is No Evidence of Protection of Local Creditors to the Detriment of U.S.-Based Creditors

Finally, the Ad Hoc Group attempts to demonstrate that U.S.-based creditors, including U.S.-based Noteholders, were the targets of prejudice or mistreatment in the Brazilian Bankruptcy Proceeding. The facts are to the contrary. As described in the Law Stipulation, the Brazilian Constitution requires that Brazilians and foreigners be treated equally before the law. (Law Stip. at ¶ 24.) In accordance with the laws of Brazil, and as provided in the Stipulation of Facts, all of the Rede Debtors' creditors, including the Ad Hoc Group and U.S.-based creditors, received a full and fair opportunity to participate in the Brazilian Bankruptcy Proceeding by, among other things, objecting to the bankruptcy filing; filing proofs of claim; filing motions concerning substantive consolidation of the Rede Debtors for plan purposes; attending creditors' meeting and having a representative appointed to the creditors' committee; voting on the Plan; and filing numerous objections, motions for clarification, appeals, and requests for stays pending appeal. There is no evidence that U.S.-based creditors failed to receive notice of the Brazilian Bankruptcy Proceeding or were prevented from participating in the Brazilian Bankruptcy Proceeding. No proof of mistreatment of U.S.-based creditors has been provided to the Court.

More importantly, however, it appears that only two of the Rede Debtors' known creditors, including known Noteholders, are located in the United States: (i) Merrill, a member of the Ad Hoc Group, which holds approximately 8.1 percent of the Perpetual Notes (worth approximately USD$40 million in face amount)[59] and (ii) the IADB, the holder of the majority in amount of the Concessionaire Creditor Claims, which is not a member of the Ad Hoc Group and which supported confirmation of the Brazilian Reorganization Plan.  (Reply at ¶ 37.)  In any event, the members of the Ad Hoc Group hold, in the aggregate, only 37 percent of the outstanding Perpetual Notes, and Merrill is the only Ad Hoc Group member located in the United States.  (Fact Stip. at ¶ 80.)  In essence, the Ad Hoc Group is complaining of mistreatment directed at U.S.-based creditors generally, but Merrill is the sole U.S. creditor that does not support the Brazilian Reorganization Plan.  There is no evidence in the record that demonstrates that Merrill or any other U.S.-based creditor was targeted, and the Ad Hoc Group declined the opportunity to present evidence to the Court to support this contention.

The Ad Hoc Group also argues that, in adopting MP 577, which prohibits bankruptcy filings by electricity distribution concessionaires, the Brazilian government and ANEEL attempted to ensure that "local creditors, primarily at the operating level, would be unimpaired by any restructuring process."  (Objection at 8.)  The Ad Hoc Group argues that MP 577 did so by "shift[ing] all the risk to a much smaller (in number) pool of financial creditors at the holding company level."  (*Id*.)  Creditors at the holding company level always have greater risk than creditors of the operating companies, as they have no right of payment before subsidiary debt is paid in full.  Moreover, the Ad Hoc Group fails to demonstrate that the purpose of MP 577 was to protect local, operating level creditors.  Rather, the Stipulation of Facts makes clear that the main objective of the Brazilian government in passing the MP 577 legislation was to give more

---

[59]    5/9/14 Tr. at 23:19-24:4.

security to the energy supply in Brazil.  (Fact Stip. at ¶ 20 (discussing press release issued by the MME of Brazil).)  The legislative history of MP 577 also indicates that the Brazilian government passed the measure in order to prevent public electric power concessionaires or permit holders from entering into bankruptcy, as CELPA did.  (Fact Stip. at ¶ 19.)  The Brazilian government's exercise of its regulatory power in this manner is not manifestly contrary to U.S. public policy. As in Brazil, electricity distribution utilities in the United States are heavily regulated by U.S. state and federal governmental regulators in order to protect the public interest.  U.S. regulators routinely engage in various activities designed to regulate electricity distribution utilities, including by setting the rates such utilities charge customers, licensing market entrants, approving the utilities' financial transactions, and setting service quality standards.  Accordingly, the Court finds no evidence of targeted mistreatment of U.S.-based creditors by the passage of MP 577.

The public policy exception embodied in section 1506 permits a court to decline to take any action, including granting additional relief or assistance pursuant to section 1521 and 1507 of the Bankruptcy Code, if such action would be manifestly contrary to the public policy of this country.  Where, as here, the proceedings in the foreign court progressed according to the course of a civilized jurisprudence and where the procedures followed in the foreign jurisdiction meet our fundamental standards of fairness, there is no violation of public policy.

## **<u>CONCLUSION</u>**

Based on the foregoing, the Plan Enforcement Relief is granted.  The parties are directed

to submit an order granting the Plan Enforcement Relief in accordance with this Decision.


Dated: New York, New York
       August 27, 2014

                                     <u>/s/ Shelley C. Chapman</u>
                                     UNITED STATES BANKRUPTCY JUDGE